(108 App. Div. 150.)

## In re CLARK.

(Supreme Court, Appellate Division, Fourth Department.    October 11, 1905.)

1. CHAMPERTY—CONTRACT OF ATTORNEY TO PROCURE CAUSES ON WHICH TO
    SUE—STATUTORY PROVISIONS.
        An attorney agreed to pay an agent a specified sum for such causes of
    action as he might obtain, accompanied by an authorization to bring suit
    for their enforcement.   Subsequently the attorney and the agent entered
    into a written contract which provided that the agent should have "one-half
    of the proceeds realized by" the attorney "on account of said claims."  *Held*,
    that as the contract required the attorney to divide equally with the agent
    whatever amounts he received on account of the claims procured, whether
    costs, bonuses, or percentages, it was within Code Civ. Proc. §§ 73, 74,
    prohibiting an attorney from being interested in buying a thing in action
    for the purpose of bringing action thereon, and prohibiting an attorney
    from promising a valuable consideration to any person as an inducement to
    placing in his hands a demand for the purpose of suing thereon.
        [Ed. Note.—For cases in point, see vol. 9, Cent. Dig. Champerty and
    Maintenance, §§ 35–40.]

2. ATTORNEYS—DISBARMENT—GROUNDS—MISCONDUCT—EVIDENCE—SUFFICIENCY.
        Evidence in a proceeding to disbar an attorney examined, and *held* to
    support a finding that he, as executor, fraudulently represented to a
    creditor that the estate of the testator was insolvent, and induced the
    creditor to assign his judgments for a nominal consideration, and pro-
    cured the creditor to satisfy the judgments; that he failed to pay over
    money collected by him for clients; that he employed agents to induce
    people to place in his hands claims against corporations on which suits were
    to be brought; and that he, on receiving the claims, entered into negotia-
    tions with the officers of the corporations looking to a settlement which
    should pay him a substantial compensation as for costs, leaving his
    clients to shift for themselves—warranting his disbarment as an attorney.
        [Ed. Note.—For cases in point, see vol. 5, Cent. Dig. Attorney and
    Client, §§ 51, 55, 56, 75.]

Proceedings by Frank O. Bailey for the disbarment of Arthur E.
Clark.   On motion to confirm the report of the referee appointed to
take proof and report to the court.   Judgment of disbarment.

See 88 N. Y. Supp. 1094.

The proceeding was commenced early in March, 1904, by filing with this court
a petition, duly verified by one Frank O. Bailey, of Syracuse, N. Y., praying
for the disbarment of Arthur E. Clark as attorney and counselor at law,
because of certain acts, omissions, and delinquencies specifically set forth in
11 separate and distinct charges contained in said petition.   Upon such peti-
tion, after due deliberation and on the 9th day of March, 1904, an order was
made requiring Mr. Clark to show cause why the prayer of the petitioner
should not be granted.   Upon the return of such order to show cause Mr.
Clark filed an answer wherein he either denied or sought to explain each of
the charges preferred against him.   He expressly denied any intentional wrong-
doing in the premises, and alleged matter tending to prove him guiltless in that
regard.   Thereafter, and on the 3d day of May, 1904, the court made an order
referring the matter to Hon. Charles A. Hawley, of Seneca Falls, N. Y., an able
and most reputable attorney and counselor of this court, to take the proofs upon
the issues raised by the petition and answer and to return the same, together
with his opinion thereon.   The evidence has been taken; the respective parties,
aided by eminent counsel, having been given the amplest opportunity by the
learned referee to produce any documents or witnesses which might throw
light upon any of the issues involved.   All the evidence, with the referee's
report, containing findings of fact and stating the conclusions which in his
opinion should be drawn therefrom, has been returned to and is now before us.

The learned referee reports that in his opinion 8 of the 11 charges have been fully established by the evidence, and that as to the other 3 the acts complained of were proven to have been committed, but held in effect that such acts did not constitute a wrong in law. Upon the evidence so returned confirmation of the report is asked for. It only remains for us to determine whether or not the facts are as found, whether or not the conclusions drawn therefrom by the referee are justified and correct, and, if so, then what punishment should be imposed upon the accused.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Bayard J. Stedman, Dist. Atty. (Selden L. Brown, of counsel), for petitioner.

William C. Watson and Adelbert Moot, for defendant.

McLENNAN, P. J. In entering upon a discussion of the facts disclosed by the evidence and the conclusions to be drawn therefrom, we fully realize the responsibility and the importance of the investigation. The heretofore good standing of the defendant, the vital interest which he has in any determination which we may reach, the duty which we owe to the court, to the members of the profession of the law, and to the public, admonish us to be diligent in our examination and to be actuated solely by a desire to do exact justice, uninfluenced by prejudice because of any seeming delinquencies or by sympathy or friendship for a member of our profession. Our labor is much lessened, however, because practically the facts are not in dispute, and because the referee in his exhaustive report has presented them fairly and concisely, and has with much care fortified his conclusions by a reference to and an analysis of the important features of the evidence.

The first two charges relate to the same transactions and may properly be considered together. Charge No. 1 is in effect that the defendant, as executor of the last will and testament of one Elias Pettibone, deceased, duly verified and presented to the surrogate of Genesee county a false account, in that he credited himself with having on March 21, 1892, paid in full two judgments recovered against said Pettibone by one Strable, which amounted on that day, principal and interest, to $196.61 and $109.25, respectively, when in truth and in fact he had not paid to exceed $65 on account of the same. Charge No. 2 is in substance that the defendant about the 1st day of May, 1903, procured Strable to satisfy said two judgments by falsely representing that the Pettibone estate was practically insolvent, and to enable him (the defendant) to present vouchers to the Surrogate's Court upon the settlement of the estate showing their payment in full, when in truth and in fact such estate was solvent and such payments had not been made. The facts in regard to these two transactions and alleged charges of misconduct are as follows: In the year 1890 one Elias Pettibone died in the county of Genesee, N. Y., leaving a last will and testament appointing the defendant sole executor, which was duly admitted to probate on February 8, 1890, letters issued to him, and he immediately entered upon the discharge of the duties of his office. About March 23, 1903, 13 years after his appointment, proceedings were commenced to compel the defendant to account as such executor; he not having

during that time taken any steps to that end. Thereafter, and on May 4, 1903, the defendant filed an account, duly verified, in which, among other things, he stated that he paid in full the two Strable judgments on the 21st day of March, 1892, amounting at that date, principal and interest, to the sum of $305.86, and he so credited himself in the schedule annexed to said account. Objections were filed to the account, and both Strable and the defendant gave evidence before the surrogate in respect thereto, with the result that it appeared without contradiction that he had not paid to exceed $65 on account of said Strable judgments, and he stipulated such to be the fact. Thereupon a decree was made requiring him to pay the balance to Strable.

Admittedly the account and verification of the same were false. It is urged, however, that any error or discrepancy in that regard was the result of personal inattention or carelessness, caused by the pressure of more important business in which the defendant was at that time engaged. Such suggestion makes it necessary to consider the proof given in support of the second charge. From that it appears that within a few months after the defendant was appointed executor he received, as the proceeds of lands belonging to the estate in Pennsylvania sold by him, the sum of $800, and that such estate was at all times thereafter perfectly solvent. In fact the only claims against it were the two Strable judgments, another judgment in favor of one Morris for about $180, and other small claims amounting in the aggregate to not more than $125. There was, therefore, no valid reason why all claims against said estate should not have been paid at once and in full, and so notwithstanding the will provided that the estate should not be distributed until certain of the beneficiaries reached the age of 21 years. In 1892, and about the time of the alleged payment of the Strable judgments by the defendant, Strable learned of the sale of the Pennsylvania property and called upon the defendant at his office for the purpose of obtaining payment of his judgments. He saw the defendant, with his clerk, a Mr. Long, and was informed by them that the Pettibone estate was practically insolvent and that he could not expect to realize anything. There was then more than sufficient funds in defendant's hands to pay the same in full and all other claims against the estate. Strable was induced by such false and fraudulent statements to assign to Long, defendant's clerk, his judgments for $18 and $15, respectively. Matters thus rested for 11 years, and until 1903, when proceedings were commenced, as before stated, to compel the defendant to account. The hearing upon such accounting was appointed for May 4, 1903. A day or two previous the defendant sought and found Strable and asked him to execute a discharge and satisfaction of his two judgments, again representing and stating to him that the Pettibone estate was practically insolvent; that practically the judgments were of no value, but that he (the defendant) wanted satisfactions of the same in order to present them as vouchers to the surrogate. Believing such representations to be true, Strable executed such satisfactions, receiving no additional consideration therefor, and upon the day following the defendant verified his account, in which he stated that he 10 years before had paid the judgments in full. He

also omitted to state, and the account failed to show, that the $800 or any other sum for the Pennsylvania lands had been received by him. The account concededly contained many other inaccuracies, but they are not embraced in the specific charges being considered, and so need not be discussed in detail.    Objections having been made to the account, and the foregoing facts, with others, appearing before the surrogate, a decree was made directing the defendant to pay to Strable the balance of his said judgments, which he did.    It also directed that the defendant be charged with the proceeds of the Pennsylvania real estate and interest on all sums in his hands, and that he be not allowed any commission as executor because of the improper manner in which he discharged the duties of his office.

The evidence relating to the two charges referred to conclusively shows that while the defendant, as executor of .the Pettibone estate, had in his possession money more than sufficient to discharge every obligation against it, he procured or permitted two valid claims amounting to $305.86 to be assigned to his clerk for $18 and $15, respectively, and that a day or two before he presented his verified account to the surrogate, in which he stated that he had paid said judgments in full, principal and interest, he told and represented to the judgment creditor that there were no assets of the estate with which to pay any part of the same, and upon such representation, which was false and untrue, obtained satisfactions of the same.    Ignorance on the part of the defendant as to the true state of facts respecting the matters adverted to is practically the only defense which is suggested, and our attention is called to the last paragraph of the verification in support of that proposition.    It is as follows:

"This deponent further says that all the matters in connection with this estate passed through the hands of Edwin C. Long, who at the time the estate was settled was a clerk in the office of deponent; that deponent has little actual knowledge of any of the matters herein set forth, his information in regard thereto being derived from certain memoranda which were made by the said Long and which are now in deponent's possession, and from various papers which have come into his possession lately, and from his correspondence with the said Long."

If only the form of verification were to be considered, we might accept the plea of ignorance of the contents of the account and of the facts respecting the same; but when we are informed that the account, which credited the defendant with having paid the Strable judgments in full, was verified only a day or two after he had represented that there were no funds with which to pay the same, and when we remember that said judgments were not in fact paid, notwithstanding there were ample funds for that purpose, but which were omitted from the account, we are compelled to the conclusion, as was the learned referee, that the defendant willfully and knowingly falsely verified his account as executor, as charged.    We are also constrained to hold that the defendant procured Strable to satisfy and discharge said judgments by means of false and fraudulent representations, which the defendant well knew to be false and fraudulent.

Charges Nos. 3 and 4 are alike in character, alleging the improper retention and failure to pay over moneys collected for clients.    Charge

No. 3 is that on the 7th day of January, 1903, there was placed in defendant's hands for collection by attorneys in Bradford, Pa., a claim of $26.35 against one Ide of Bergen, N. Y.; that in March following said claim was paid in full to the defendant; and that he failed to account for or pay over the same. In charge No. 4 it is alleged that in the year 1902 the estate of one Jane E. Russell, deceased, was being settled in the Surrogate's Court of Genesee county; that the defendant was retained as attorney for, and represented upon such settlement, one Harriet J. Crandall, now deceased, of Auburn, Cal.; that the surrogate determined that the distributive share of said estate belonging to her was $266.15, and that on October 18, 1902, said sum was paid over to the defendant, he giving a receipt for the same; that the defendant neglected to pay over the money so received by him, or any part thereof, until about the month of August, 1903, and in the meantime falsely stated and represented in effect that he had not received the same.

As to the first of these charges, it appears that the attorneys in Bradford who placed the claim in defendant's hands for collection wrote to him at least five times between April 2d, the date when the amount was received by the defendant, and the 28th day of September following, asking for a statement of what he had done in the premises. They then wrote the debtor, and, being informed by him that he had paid the claim, they again wrote to the defendant, urging him to remit the amount of the claim. The defendant did not reply to any of such letters, or pay any attention to the same. Thereafter, and some time in December following, the Bradford attorneys placed the claim against the defendant in the hands of one Squires, of Batavia, N. Y. He saw the defendant about it, and was informed that he had remitted for the Ide claim by check some time previous, and that, if the Bradford attorneys had not received the same, he would send another, which he did under date of March 10, 1904, after this proceeding was instituted. The amount involved in this transaction is comparatively small, and we would not have stated the facts with so much detail, had it not been for the suggestion that the failure to remit for so long a time was solely due to carelessness and neglect, and that in fact the remittance had been made by check, which was lost, and because the same defense, carelessness and lost check, is offered as a defense to the fourth charge. In respect to that charge it appears that on the 8th day of October, 1902, the defendant received $266.15, the distributive share of his client, Mrs. Crandall, in the Russell estate. It then became his duty to pay over the same, but instead, on the 27th of April following, he wrote to the local attorneys for Mrs. Crandall in California, through whom he had been retained, that he expected the matter would be settled up shortly. He wrote:

"I beg to say that I expect the matter will be settled up very shortly. I beg your pardon for not having answered your letters before, but have been away, and have been expecting I would be able to get the money and send it to you a long time ago."

On July 27, 1903, the California attorneys again wrote to the defendant, and on August 15th he answered by stating that he had paid the

claim by check on June 6th; but on August 26, 1903, in answer to a very pointed and urgent letter from them, he sent a New York draft for the amount, again stating that he had sent them a check for the same on June 6, 1903, which had been lost. There is no proof that such check was sent, except the statement in the letter referred to and some other memoranda, all made by the defendant. As stated by the referee:

"No proof of the check of June 6th, or of the return of the letter inclosing it, either upon return card or through dead letter office, or any evidence whatever of the fact that such check was sent, was produced on the hearing. Like the third charge, where the miscarriage of a check is alleged, the charge is permitted to rest without any attempt to prove the explanatory matter. And in this case the proof affirmatively shows the false statement of an expectation that the matter will be settled and that he may be able to get the money, some six months after the money had been actually paid over and was in his hands."

We are forced to the conclusion reached by the referee that the third and fourth charges have been fully established by the evidence, and that the offenses committed were not merely the result of carelessness and mistake, but show a deliberate purpose to withhold and use moneys belonging to his clients, and that he knowingly misrepresented in respect to the collection of the same, to the end that he might avoid or delay payment. The defendant has himself given no testimony in excuse of the acts referred to, and we have searched the record in vain for facts which would justify the conclusion that such conduct on his part was the result of mistake or because of ignorance of the facts. The improper retention of a client's money by an attorney, however small the amount, constitutes a breach of duty, and, if intentional, demonstrates unfitness to be trusted with the discharge of the duties and responsibilities resting upon an attorney and counselor at law. It should be understood once for all—we believe it is understood—that a client's money or its use does not belong to an attorney, but that in his hands it is a trust fund, to be kept sacredly and absolutely inviolate. Mistakes may occur, and honest differences may arise between attorney and client as to how much of a collection should be retained by the attorney for his services; but that he may retain the same for his own use and purposes, however temporary, is a proposition to which we cannot assent. It is all summed up in the statement that any and all moneys or property which come to an attorney as trustee, executor, or agent constitute a trust fund in his hands, and his office should be a sufficient guaranty that it will not be misappropriated or diverted.

The fifth charge is in effect that the defendant was guilty of a violation of sections 73 and 74 of the Code of Civil Procedure, and incurred the penalty prescribed by section 75. The sections are as follows:

"Sec. 73. An attorney or counselor shall not, directly or indirectly, buy, or be in any manner interested in buying a bond, promissory note, bill of exchange, book debt, or other thing in action, with the intent and for the purpose of bringing an action thereon.

"Sec. 74. An attorney or counselor shall not bind himself, or by or in the name of any other person, either before or after action brought, promise or give, or procure to be promised or given, a valuable consideration to any person, as an inducement to placing, or in consideration of having placed, in his hands, or in the hands of another person, a demand of any kind, for the purpose of

bringing an action thereon. But this section does not apply to an agreement between attorneys and counselors, or either, to divide between themselves the compensation to be received.

"Sec. 75. An attorney or counselor, who violates either of the last two sections, is guilty of a misdemeanor; and, on conviction thereof, shall be punished accordingly, and must be removed from office by the Supreme Court."

The facts are: About the year 1896 the defendant entered into a verbal contract with one Charles A. Snell, of Syracuse, N. Y., by which he employed Snell to solicit persons to retain the defendant as their attorney to begin actions against telephone and telegraph companies for maintaining poles in the highways passing over premises owned by them; the defendant agreeing to pay Snell $3 for each claim or case which he might obtain. Snell was to obtain from the landowner a written statement of his claim, a formal writing retaining the defendant as his attorney, and authorization to commence an action to enforce such claim. Under such agreement Snell procured and turned over to the defendant a large number of claims and retainers, principally against the Bell Telephone Company of Buffalo, most of which were in favor of persons residing in or in the vicinity of Batavia, N. Y., defendant's place of residence. Snell claimed that he could not afford to solicit or obtain claims from people residing outside of Batavia for $3 per claim, and thereupon defendant verbally agreed to pay him $5 for each claim so obtained. Under such second agreement Snell obtained about 300 claims. Thereafter, for the purpose of covering a larger extent of territory, a written agreement was entered into between the defendant and Snell, of which the following is a copy:

"It is agreed by and between Arthur E. Clark and C. A. Snell, both of Batavia, Genesee county, N. Y., that the said Snell shall work for the said Clark in getting telephone and telegraph contracts in the same manner as he has done heretofore, and that said Clark agrees to pay him one-half of the proceeds realized by said Clark on account of said claims. Said Snell is to pay his own expenses while he is out soliciting the said claims, said Clark is to pay his own expenses while he is out settling, and, in case said Snell goes out and settles them, said Clark is either to pay Snell's expenses while he is out, or said Clark is to see that said Snell's expenses are paid by the company or companies. Said Clark to have the right to hire other men to do the same work, provided he cares to. Said Snell to have the right to employ men to work under him, but said Clark is to have the same share in the proceeds of their work.

"Dated 22 February, 1897.

"Arthur E. Clark.
"C. A. Snell."

Formal blanks were prepared for the carrying out and consummation of this traffic in actions or litigation, of which the following are samples:

"My claim for damages against ——— Company is as follows:

For ———               poles at $ ——— each ................. $ ———
For mutilating ——— shade trees at $ ——— each ................. $ ———
For mutilating ——— fruit trees at $ ——— each ................. $ ———

                              Total ................... $ ———

"And I hereby certify that I have received nothing from said company on account of said damages, and that I have never consented to its occupancy of my land.

"I hereby retain Arthur E. Clark, of Batavia, Genesee county, New York, as my attorney, and authorize him to commence or cause to be commenced an action in my name against the ———— for the recovery of the possession of my real estate described as follows:

"All that portion of my land situate in the town of ————, county of ————, and state of New York, lying and being within the boundaries of what is known as the ———— road, and being a portion of my said lands which are subject to use for highway purposes.

"Dated at ————, this ———— day of ————, 1897.

"[Signature of Landowner].

"To [Landowner]:

"I hereby accept your retainer in your case against the ————, and I agree to accept from you 10 per cent. of the damages recovered by you from said company in full compensation from you for my services.

"[Signature of Mr. Clark].

"I hereby agree to the terms of the foregoing contract. And I further agree not to settle the above claim without first obtaining said Clark's written consent.

"[Signature of Landowner.]"

Under his written contract with the defendant, Snell and agents whom he employed obtained and turned over to the defendant about 2,000 claims in favor of persons living in all parts of the state. Upon several of these claims suits were begun, and many of them were settled without suit. As compensation to Snell for the services so rendered the defendant claims to have paid him $3,500 or more. The defendant has received a very large sum of money because of such retainers and because of his employment as attorney at the solicitation of Snell under the contract or agreement referred to.

It would seem clear that the contracts in question, when their real meaning and purport is ascertained, and the connection of the defendant therewith, fall squarely within the condemnation of the sections of the Code quoted. That such conduct on the part of an attorney was and is illegal we think is beyond dispute. Hirshbach v. Ketchum, 5 App. Div. 324, 39 N. Y. Supp. 291. In that case the plaintiff, who was not an attorney, procured a contract from a firm of importers, by which they employed the defendant, who was an attorney and counselor at law, to prosecute certain claims which they had against the United States, and agreed that such attorney should retain one-half of the amount recovered as compensation for his services. The defendant agreed to divide the amount so to be retained by him with the plaintiff for having obtained such contract from the firm of importers. In an action brought by the plaintiff, the person who obtained the contract from the importers, against the defendant, to recover one-half of the amount which he retained under said contract, it was held that the agreement by which the defendant was to divide his compensation with the plaintiff was champertous, fell squarely within the condemnation of section 74 of the Code, and was null and void, and therefore could not be enforced. The decision in that case was approved and followed in Irwin v. Curie, 56 App. Div. 514, 67 N. Y. Supp. 380, where the facts were practically the same as in the Hirshbach Case, supra. The Irwin Case, supra, was reversed by the Court of Appeals (171 N. Y. 409, 64 N. E. 161, 58 L. R. A. 830) solely upon the ground that the section of the

Code did not apply to a person not an attorney and counselor at law. But it was expressly stated in the opinion of the court that:

"This statute [section 74 of the Code] was levelled against attorneys and counselors to the ranks of which this defendant belonged, and therefore it operated directly upon him."

Again the court said:

"Its [the statute's] prohibition is directed against the attorney and counselor, who is an officer of the court, and the very next section (75) provides that 'an attorney and counselor who violates either of the last two sections is guilty of a misdemeanor.' Here again we note that the penalty inflicted is upon the attorney and counselor alone, and not upon his accomplice or possibly intended victim."

The acts of the defendant in the case at bar are the same in principle as those complained of in the cases referred to, and, as we have seen, such acts, when done by an attorney and counselor, fall within the condemnation of the statute. First the defendant agreed with Snell to pay him $3 for such causes of action as he might obtain, accompanied by an authorization to bring suit for their enforcement. The compensation was afterward increased to $5 per claim. Then the formal contract was entered into which provided that Snell should have "one-half the proceeds realized by Clark on account of said claims." "Proceeds," as used in the contract, clearly meant that the defendant should divide evenly with Snell whatever amount he received on account of such claims, whether costs or bonuses paid by the company, or percentages paid by clients on the amounts recovered for them, respectively. Such being the real meaning and purport of the agreement, we think it is beyond question that it is within the prohibition of the statute. The defendant understood it was of that character, because he alleged, in a verified answer interposed in an action brought against him by Snell, that it was champertous and void.

But, aside from the legal proposition, we think the conduct of the defendant shows an utter failure to appreciate the duties of an attorney and counselor at law and the relations which ought to exist between him and his clients. It cannot be possible that it is permissible for an attorney to employ agents to canvass the citizens of a considerable portion of our state to induce them to authorize the commencement of actions in their name, under an agreement with them that the attorney for his compensation shall have a certain percentage of the recovery in case any is had, and with the agent that he shall share equally in any compensation which the attorney may receive. In the case of the defendant he practically, through his agent or agents, purchased the claims of several thousand landowners for the purpose of bringing actions thereon, and his compensation therefor was fixed definitely and specifically. So many poles, so many dollars damage; a certain percentage of the recovery, if had, was the measure of his compensation. And it was certainly understood that he was to pay any and all expenses of the litigation, and, if so, then such agreement falls within the prohibition of section 73 of the Code of Civil Procedure. We agree with the learned referee in the conclusion that, because of the making of the contracts referred to and the defendant's acts thereunder, he was guilty of viola-

tion of the provisions of the sections of the Code of Civil Procedure to which attention has been called.

The remaining charges, Nos. 6, 7, 8, 9, 10,. and 11, all have reference to the acts or conduct of the defendant under or by virtue of similar contracts respecting claims against the Bell Telephone Company or like corporations.

In charge 6 it is alleged that under his contract with the defendant Snell procured one Colby to retain the defendant to begin an action against the Bell Telephone Company to recover possession of his real property which was occupied by said company's poles, which Clark agreed to prosecute for 10 per cent. of the damages recovered; that he presented said claim, together with about 150 others, for settlement, and he agreed upon a settlement by which he was to be paid $25 for each claim, and in addition the sum of $4 for each pole in front of the premises of his respective clients; that he represented to Colby that he received no other compensation for his services than the 10 per cent. of the damages paid; that in many other of the cases he did not inform his clients that he was being paid by the telephone company. The charge is in substance that there was a secret agreement between Clark and his client's adversary by which he (Clark) received compensation from such adversary for the services which were supposed by his clients to be rendered solely for them and for which they paid him in full.

The seventh charge is practically of the same character.

The eighth charge is that in a large number of claims, secured by the defendant in the same manner as stated in the fifth charge against the Empire State Telephone & Telegraph Company, the defendant settled such claims with the company for $25 per case, and that he appropriated the whole of the amount so received to his own use, and his clients received nothing. In other words, after his costs were paid, he turned over his clients to the telephone company and agreed with such company to assist it in making a fair settlement with his clients. He received, by reason of such transaction with the telephone company, at least $1,250, and so far as appears his clients were not benefited in the slightest degree by any services rendered by him for or on their behalf.

The ninth charge is in effect that he falsely represented to certain of his clients, on account of whose claims against said company he had received the sum of $25, that the Empire State Telephone & Telegraph Company was insolvent and was of doubtful financial worth, and that he had decided to have nothing more to do with the claims against it. Thus, as said by the referee:

"Clark, having obtained $1,250 for himself, represented to his clients personally and through Case [his agent] that the company was insolvent and unable to settle."

The tenth charge is that the defendant procured to be placed in his hands for collection in the manner before indicated a large number of claims against the Central New York Telephone & Telegraph Company; that he presented said claims to the company and received in settlement thereof the sum of $3,000, all of which he appropriated to his own use, except such part as he turned over to his agent, Snell, for procuring him to be retained by the several claimants. The corre-

spondence between the defendant and the manager of such company, which is annexed to and made a part of the referee's report, conclusively shows that the defendant abandoned his clients, had turned them over to the company which he was employed to prosecute, and in addition agreed to aid such company in any effort which it might make to secure a settlement from his clients at the least possible sum. Such letter and contract are as follows:

"Batavia, N. Y., Mch. 9, 1898.

"Mr. C. A. Nicholson, Gen. Mgr. Central New York Telephone Co., Auburn, N. Y.—Dear Sir: As the result of our conversation in Rochester, I make you the following formal proposition in regard to the cases I now have against your company: First. You are to pay me twenty-five dollars for each case I now have against your company and which you settle under the terms of our agreement. Second. You are to have the privilege of settling them at your own terms and figures as far as possible. Third. I am to write conciliatory letters to all who write asking about settlements and to aid in every way possible in making these settlements. But I am to retain my hold over my clients as far as possible, so that they will not go to other attorneys. Fourth. The settlements to be made by your company within one year from date if possible. Fifth. Payments to be made as follows to me: One thousand dollars within ten days from date; five hundred dollars within three months; five hundred dollars within six months. Sixth. A settlement to be made at the end of the year, in which your company is to give me the name of each case arranged, and you are to pay me the balance due on the cases settled, and we will then arrange a plan for settling the balance. This is about the way I think the matter had better be adjusted. I may tell you that the Empire State people have arranged their cases on this basis, and that they have been settling them so that neither they nor I have had any trouble. I have written and do write to my clients every few days, telling them they had better settle if the company is disposed to do what is fair, and either I hear nothing from them or sometimes my clients write that they have settled.

"Believe me, yours very truly,                    Arthur E. Clark.

"Of course, you understand the necessity of not showing this letter or letting the contents be known."

"Law Offices of Arthur E. Clark, Cor. Main and Bank Streets, Batavia, N. Y.

"Batavia, N. Y., Aug. 29, 1898.

"Mr. C. A. Nicholson, Gen. Mgr. Central New York Tel. & Tel. Co., Utica, N. Y.—Dear Sir: Mr. Snell and myself make you the following offer in regard to the settlement of the claims we have against your company: You are to pay me in all three thousand dollars. Fifteen hundred dollars at the time this agreement is made, and one-half the balance when fifty per cent. of the claims are settled and within one year from date. The balance of the money to be paid within two years from date and when seventy-five per cent. of the claims are settled. The payment of fifteen hundred dollars to be made on or before September first, 1898. I am to help you in the settlement of these cases as far as I am able and yet keep my clients with me; that is, it will not do for me to do or say anything that will drive them away. And neither Snell nor myself are to take any more claims against your company or to foster any litigation against it.

"Yours very truly,                    Arthur E. Clark.
                                      "C. A. Snell."

The eleventh charge is in many respects similar to those referred to in this connection, but the charge is not found by the referee to have been sustained and a discussion of the facts pertaining to it is unnecessary.

Substantially all the charges presented against the defendant have been established, and practically by uncontradicted and undisputed evidence, and in our opinion the acts and omissions complained of indicate

a total lack of a proper appreciation of the duties and responsibilities of an attorney and counselor of the Supreme Court, and in several instances point to acts of actual criminality. The acts disclosed by the evidence and to which we have already alluded are not the act or acts of a day or a month, but they extend over a period of 13 years, commencing in 1890 with the failure to charge himself with $800 received by him as executor. Two years later, apparently to cover such failure, he represented to a creditor of the estate that it was insolvent, and induced such creditor to assign to his clerk two valid judgments, amounting in the aggregate to $305.86, for $18 and $15, respectively. Ten years later, in an attempt to conceal such transaction, he procured such judgment creditor by false and fraudulent representations to satisfy and discharge such judgments. In 1903, after receiving $266.15 as his client's distributive share of an estate, and while the same was in his possession, he wrote in substance that the claim had not been paid, but after repeated demands upon him paid such claim, with the statement, however, that a check had previously been sent by him, which had been lost or miscarried. The same is true of the other claim placed in the defendant's hands for collection a short time before, to which attention has been called. Then in 1896 the defendant practically opens a litigation hunting agency, hires agents to induce people throughout the state to place in his hands claims against certain corporations upon which suits were to be brought, or for settlement or adjustment, with the result that he immediately entered into negotiations with the representatives or officers of such corporations, looking to a settlement which should pay him a substantial compensation as for costs, leaving his clients in the majority of cases to shift for themselves, apparently utterly disregarding the rule that the duty of an attorney is solely to protect the interests of his clients, and that no secret agreement or understanding shall exist between such attorney and his clients' adversaries.

Without deciding or intending to foreclose the defendant on any questions of law which may be presented in any action or proceeding involving the facts adverted to, we are forced to the conclusion that the conduct of the defendant as disclosed by the whole evidence, which is uncontradicted, is such as that he ought not to be retained upon the roll of attorneys and counselors of the Supreme Court of this state. We are not unmindful of the fact that many of the leading and most reputable attorneys and counselors of this court in the Fourth Judicial Department have testified to the good standing, reputation, ability, and faithfulness of the accused as attorney and counselor at law, and that such standing and reputation ought to be considered and given full weight when an attorney is accused of wrongdoing. If the evidence against the defendant showed only a single offense or lapse of duty, or if we were satisfied that the offenses charged were the result of mistake or inattention, or even carelessness, while we would be disposed to condemn, we might hesitate to punish; but in the case before us we are compelled to the conclusion that the conduct of the accused during the period covered by our investigation is such as to make him unfit to longer remain an accredited attorney and counselor of the Supreme Court of this state.

The conclusion is that the referee's report should be confirmed, and that an order should be made striking the name of Arthur E. Clark of Batavia, N. Y., from the roll of attorneys and counselors of the Supreme Court, and forbidding his practicing in any of the courts of this state. All concur, except NASH, J., not voting.