(156 App. Div. 470.)

In re WELCH.

(Supreme Court, Appellate Division, First Department.   May 2, 1913.)

1. ATTORNEY AND CLIENT (§ 53*)—DISBARMENT—GROUNDS.

Where an attorney by false statements secured admission to hospitals, and then induced patients to sign contracts which they were not in a condition to understand, and advised them to simulate more serious injuries than they had actually sustained such conduct, when considered together with his insolent behavior before the referee and the fact that he had previously been before the court on charges of professional misconduct, justified his disbarment.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 74, 75; Dec. Dig. § 53.*]

2. CHAMPERTY AND MAINTENANCE (§ 5*)—CONTINGENT FEE—AGREEMENT TO DIVIDE—VALIDITY.

While a valid agreement may be made between an attorney and a client for a contingent fee, the execution of an agreement to divide such fee with a third person not a lawyer, by which such third person is to be compensated for services rendered, being made a misdemeanor by Penal Laws (Consol. Laws 1909, c. 40) § 274, renders void the contract of retainer.

[Ed. Note.—For other cases, see Champerty and Maintenance, Cent. Dig. §§ 24–51; Dec. Dig. § 5.*]

Charges by the Association of the Bar of the City of New York against Ernest M. Welch, an attorney.   Respondent disbarred.

See, also, 152 App. Div. 885, 136 N. Y. Supp. 1150.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

John Neville Boyle, of New York City, for petitioner.
Ernest M. Welch, of New York City, in pro. per.

INGRAHAM, P. J.   [1] The charges against the respondent are based upon his conduct in soliciting and endeavoring to obtain contracts for actions against the New York, New Haven & Hartford Railroad Company in behalf of persons who were injured in a railroad accident which occurred on the 11th of July, 1911, at Bridgeport, Conn.   Many of those injured in that accident were taken for treatment to the Bridgeport Hospital and St. Vincent's Hospital, two institutions maintained in the city of Bridgeport.   The accident having happened on the 11th of July, 1911, the respondent went to Bridgeport the day after the accident, the 12th of July, and stayed in Bridgeport several days, stopping at a hotel there.   The respondent had known one Flury, who was one of the train hands injured at the time of the accident, having in 1904 appeared as attorney for some member of the Flury family, and had succeeded in effecting a settlement of a claim for personal injuries, but he had received no request from any one that was injured and had no other relation with any of the injured persons.   He prepared blank contracts employing him as attorney and providing for a contingent fee, and he obtained admittance to the hospitals by stating that some of those injured were his relations or were his clients, which statements were

misleading. He then went to several of the patients who were suffering from very serious injuries, and endeavored to induce them to sign such contracts. The physicians and nurses· at these hospitals protested against his actions, and finally refused to allow him access to the patients. He obtained contracts from several persons who afterwards repudiated them. The case was referred to one of the official referees who has reported that the charges were fully proved, and the referee in his report calls attention to the conduct of the respondent when before him and in the conduct of his defense. An examination of the record shows that his treatment of the referee and the witnesses who testified to sustain the charges cannot be too strongly condemned. After taking of testimony was concluded, the respondent submitted no brief, but sent an impertinent letter to the referee making the statement that these alleged charges were instigated by the New York, New Haven & Hartford Railroad Company, that the entire proceeding was full of false and absurd accusations concocted by the attorney and agents of the railroad company, and alleging that the only offense that the respondent had committed, if it can be so construed as an offense, was to make a reasonable effort through the recommendation of the friends and acquaintances to honestly earn a livelihood for his mother, wife, and three children, and the respondent believed that this was a constitutional right irrespective of the monopolistic attitude assumed by the complainant railroad company. The railroad company was not the complainant and the "monopolistic attitude," if anything of that kind existed, had nothing to do with these proceedings. And in the memorandum submitted by the respondent to this court he reiterates those charges of railroad influence, seeming to place his defense upon what he conceives to be improper action by the railroad company, of which there was no justification in the evidence, and he states that:

"The respondent did not file a brief with the official referee for the reason that his antagonistic conduct toward respondent indicated that his report would be against the respondent,"

—an attitude both before the referee and before this court which is contemptuous and without justification. The referee in his report has held that the charges were proven, and that the respondent as a witness in his own behalf created a decidedly unfavorable impression, and the referee did not believe his denials. An examination of his testimony alone justifies the conclusion at which the referee arrives.

Mrs. Flury, whose husband was injured, testified that the respondent asked her if she would go among the patients and recommend him and said to her that it would be worth her while. On cross-examination the witness reiterated that statement, and that the respondent said to her that he would make it worth her while to recommend him to other persons who were injured, and would do as much for her if she would recommend him. On cross-examination the respondent produced an affidavit signed by the witness and sworn to on the 29th of November, 1911. This affidavit is not at all inconsistent with anything the witness had sworn to except

the statement that the affiant had felt duly bound to recommend the respondent to every one who was injured in the wreck. About this affidavit the witness testified that the respondent came to her; that he wrote the affidavit in her presence; that it was written the day after the witness had made an affidavit before the grievance committee of the bar association; that the respondent told the witness that he was suing a Miss Sweeney, and he wanted the testimony of the witness in regard to meeting her; that he did not refer to the proceeding before the bar association; and that after he had written the affidavit he went out and got a notary to come in. There were also introduced in evidence two letters written by the respondent to the relatives of two persons who were killed in this accident inclosing contracts for his employment, and in which he stated to them that he knew from experience that the only way they could recover adequate compensation was to commence suit against the railroad company for at least $50,000 damages, and stating that he would guarantee the persons to whom the letters were addressed that he could recover for them ten times as much as the company would pay without any trouble to them. By these contracts the respondent agreed to give to the persons to whom the letters were written three-quarters of the verdict or net amount recovered, the respondent to retain one-quarter of the verdict or net amount recovered and the costs.

Sister Ohler, who was one of the nurses in charge of the operating room at St. Vincent's Hospital, stated that the respondent appeared in the hospital immediately after the accident and had conversations with the injured persons. The witness told the respondent that the patients were too ill to receive visitors, and for a time he did not seem to pay much attention to it, but later on he did. Two or three days afterwards the respondent had photographs taken of one of the patients who was injured.

Mary A. Sweeney was also called as a witness, and testified that she was one of those injured in the accident; that on the day after the accident the respondent came into her room, and came to her bed, and said he was an attorney, and had come to look after her case; that she had a splendid case, and could recover at least $50,-000 damages; that he had a contract all ready for her to sign, but she refused to sign it; that the next day he came to her again, and repeated the conversation, and endeavored to induce her to sign the contract; that finally she did sign the contract. The respondent told this witness that, if anybody came and inquired how she was, she should not say she was better and feeling fine, but should say that she was very bad, was not feeling any better, and was suffering a great deal of pain; telling her how she should act when she left the hospital so as to make a splendid case of it; that he called on her a dozen times, and finally she told him she did not want him any longer, that she had decided she did not want him to handle her case; that once when she was eating her dinner the respondent came in, and told her that she should not feed herself; that she should say when asked how she was that she was bad, that she was injured

badly and suffering; that after the witness had said she did not want respondent's services any longer he told her that she could not get rid of him, that she could not break her contract, and that he would push the case. After a letter had been written terminating the respondent's employment, the respondent wrote to her, saying that notwithstanding the letter he would proceed with her case pursuant to the contract and retainer; that, if she should follow the advice of her friends who did not know anything about the proper prosecution and management of the suit, she would recover very little out of it, and assuring her that her suit for $50,000 damages would receive very careful attention. On the 19th of July he wrote to her informing her that he would push the case against the railroad company for $50,000 damages pursuant to the contract and reminded her that he had prepared all the legal papers in the case, had her photograph taken, employed a physician to examine her and had spent a great deal of valuable time in attending to her matters, and then stating:

"Every physician that I employ and that examines you and testifies in your case I will pay them out of my share of the recovery pursuant to the contract or retainer which you signed and pursuant to our conversation of the other day."

Other witnesses also testified that the respondent advised them not to act too well and to pretend they were not getting on too well. One witness he advised that, when she left the hospital, she should not walk, and that, even though she had recovered, she was still to appear to be sick, and that she should have a cot or a chair to take her from the cab to the train.

The respondent apparently stated to those persons to induce them to sign the contracts that the local attorneys around Bridgeport and the judges of the courts of Connecticut were all controlled by the railroad company, so that there could not be any justice done in Connecticut. Then he wrote to the husband of one injured who had retained him that he had called upon his client the day before and she appeared very cheerful, but her injuries were very serious, and therefore the husband of his client was directed to write to her, and tell her not to be anxious to get about, as she may injure herself by even moving in bed, and stating that he had employed a Dr. Hammond to make a thorough examination, and he reported that she had been very seriously injured. The respondent also told this witness that under no circumstances was his wife to walk out of the hospital, that she must be taken out on a cot. The respondent swore that he saw in the newspapers that Mr. Flury had been seriously injured and that he had taken a train to Bridgeport to see him; that he went first to the Bridgeport Hospital, and asked the nurse whether he was there; that she said she did not know, and then she took him around through the hospital; that she introduced him to a Mrs. Slosky, and that he took up her case, and gave her a contract by which he was to receive one-third of the recovery; that he went to another room in which a Mrs. Hartmann was located; that she referred him to her husband, and that he saw her husband and

got a contract from him on the same basis; that he went to the other hospital on the same afternoon, and Mrs. Flury said she would recommend him; that on the same day he saw Miss Sweeney, and on the following day got a contract from Miss Sweeney; he denies that he told any of these people to feign any injuries, and ·not to walk, or anything of that kind; that subsequently the doctors refused to allow the respondent to see these patients, and then he denied generally that he had been guilty of any misconduct and that is all he had to say about the matter. The respondent admitted he said to Mrs. Flury when she offered to recommend him that he would do as much for her some time.

[2] Contracts between an attorney and a prospective client by which the compensation is to be measured by a percentage of the recovery and is contingent upon success are allowed by law, and when fairly made, and no improper advantage is taken of the client, are unobjectionable; but all contracts to divide such contingent fees with third parties not lawyers or by which a person procuring such a contract from another is to be compensated for the services rendered is prohibited by law and is a misdemeanor, and the contract of retainer is void. The evidence establishes and the referee has found that this respondent did promise Mrs. Flury that he would make it to her advantage if she would induce these injured persons to intrust their cases to him or make contracts with him. Such an agreement is a violation of section 74 of the Code of Civil Procedure, now section 274 of the Penal Law (Consol. Laws 1909, c. 40). Matter of Clark, 108 App. Div. 150, 95 N. Y. Supp. 388, affirmed 184 N. Y. 222, 77 N. E. 1, and what was there said by Judge Bartlett in the Court of Appeals is applicable to this case: ·  ·, ;  ·.  ·:·. ·

"It is not necessary for the protection of the poor to sanction the practice which, as applied to negligence cases under the name of 'ambulance chasing,' ·has brought deserved discredit upon those engaged in it; and in any event, if the views which have been expressed are correct, the law denounces the practice as criminal."

Then the whole conduct of the respondent in obtaining admission to those hospitals by false and misleading statements, inducing patients to sign contracts when they were not in a condition to understand what they were doing, advising the patients to simulate more serious injuries than they had actually sustained for the purpose of enhancing the damages, was all conduct inconsistent with the duty that a lawyer owes to the public and to his profession. The conduct of this respondent both before the referee and in submitting his case to this court shows how little he appreciates the obligation of a lawyer to the court and to the public. We feel that this record shows that the respondent lacks the essential qualifications which are necessary for the practice of the profession of the law and the findings of the referee are therefore approved.

In determining the extent of the discipline which should be inflicted we are considerably influenced by the behavior of the respondent before the referee, and by the fact that this is not the first occasion upon which this respondent has been before this court upon charges

of professional misconduct. We therefore have determined that the respondent is unfit to remain a member of the bar, and he is therefore disbarred. All concur.