PINDALL *v.* WATERMAN.
PINDALL *v.* SCHMIDT.

Opinion delivered December 16, 1907.

ATTORNEY AND CLIENT—EXTORTIONATE FEE—RELIEF.—Where the evidence shows that plaintiff's intestate, while greatly excited and apparently unconscious of what he was doing, employed defendants, who were attorneys, to defend him against a charge of murder, and, in consideration of such employment, conveyed to them property amounting to $7,000, retaining only $1,000, and within a few days committed suicide before his case was tried, the fee paid, in the absence of explanation, was so unreasonable, oppressive and exorbitant that equity will grant relief as to the excess.

Appeals from Desha Chancery Court; *James C. Norman,* Chancellor; affirmed.

*H. M. Armistead,* for appellants.

1. Equity has jurisdiction to inquire into the contracts of persons alleged to be insane, but, upon finding that the deceased was not insane, the chancellor had no jurisdiction to go further than to dismiss the bill.

2. Testimony of the alleged expert was improperly admitted. It was irrelevant because inquiry as to reasonable fees was not permissible. 33 Ark. 547. The contract of employment between attorney and client is considered as other contracts for personal services, and without regard to the relation.

14 Am. Dec. 177; 75 N. Y. Supp. 856; 83 *Id.* 539; 2 How. Pr. 261; 4 Cyc. 987. It is certain that the responsibility assumed by appellants was great, the undertaking arduous. There is nothing in the testimony to show that other services in the way of advice and preparation were not performed in addition to those rendered in the matter of the habeas corpus proceedings. By virtue of what authority did the court award a fee for services in the habeas corpus proceedings, entirely ignoring all other consideration, and alter contracts both express and fair, when no circumstances for equitable intervention are shown? This is not a case for application of the rule of *quantum meruit,* nor is the partial failure of consideration, if any, such as ought to affect the contract. 28 N. E. 872; 26 Ind. 289; 38 Ill. 65; 10 Tex. 81; 84 Ala. 502. The promise to perform the service was the consideration of the contract, and performance was not a condition on which the obligation depended. There has been no failure of consideration because the act of the obligor alone, without the concurrence or delinquency of appellants, prevented the further performance of the contract on their part. 7 J. J. Marshall (Ky.), 54. See also 42 Pac. 705; 63 S. W. 382; 93 Mo. 530; 5 Mo. App. 567.

*F. M. Rogers,* for appellees.

As between attorney and client, the rule is that where a contract is obtained by any undue influence of the attorney over the client, or by any fraud or imposition, or the compensation is so clearly excessive as to amount to extortion, the court will in a proper case protect the party aggrieved. 110 U. S. 42; 9 Johns. 253; 6 Am. Dec. 275; 59 Ala. 581; 31 Am. Rep. 23; 3 Am. & Eng. Enc. of L., (2d Ed.), 332; 9 L. R. A. 90, notes. The burden was upon appellant to show the fairness and equity of their dealings. 239 U. S. 560; 150 U. S. 118; 153 U. S. 216.

*H. M. Armistead,* for appellants in reply.

The distinction between the cases at bar and that relied on by appellees (59 Ala. 581) is this: in that case the contract was made after the relation of attorney and client had

been formed, while in these cases the contract was made before the attorneys entered upon the business of the client; no fiduciary relation had then commenced, and they could then make a valid contract for the measure of their compensation. 110 Ala. 307; 93 Wis. 381; 4 Sneed (Tenn.) 159; 143 Ill. 401; 58 S. W. 824; 170 Ill. 213.

BATTLE, J. The above suits grew out of the same facts, and involved the same principles of law and equity, and have been submitted for our consideration upon the same briefs.

The facts, as shown by the evidence adduced in these causes, are substantially as follows: J. J. Schmidt resided in Desha County, in this State. He was about sixty years old; was industrious and penurious; and acquired an estate of about the value of $8,089.60. He killed R. H. Willis, another citizen of Desha. He was arrested, charged with murder in the first degree. "Excitement was very high immediately after the killing. Mob violence was threatened and feared." He was hurried away to Arkansas City to avoid the mob. He underwent a great change on account of the trouble and excitement following the killing. Witnesses say, he seemed to be dazed and stunned, and not the same man he had been. He looked haggard and broken. His voice did not sound natural. He appeared to be in great trouble. He was nervous and excited. One witness says he impressed him as a man who did not know exactly what he was doing. He says: "After having been carried to dinner and then back to the court house for supper, he turned and went in the wrong direction. He didn't seem to know the way to the hotel." Witnesses differed as to his sanity, but the majority thought he was sane. He was imprisoned in jail. While incarcerated, E. S. Pindall and X. O. Pindall, two attorneys, presumably at his request, had an interview with him, while in the condition before stated. The result was he executed a note to E. S. Pindall for $5,000 for a fee for services to be rendered in defending Schmidt against the charge of killing Willis, and a mortgage on lot six in block seven in Evans's addition to the town of Dumas, and the southwest quarter of section 34 in township 9, south, and range four west, of the value of $5,000 which constituted all the real estate owned by Schmidt; and X. O. Pindall, associated with E. S., received for

services to be rendered in the same behalf the promissory note
of the Dumas Mercantile Company for $500, and .forty·shares
in the stock of the Bank of Dumas, of the par value of $25
each, and $500 in money, and a draft on the Dumas Mercantile
Company for $500, leaving Schmidt, out of an estate of $8,-
089.60, $1,089.69 represented by a small amount of cash, some
rent notes not due, two mares, some farming implements, a lot
of household furniture, two mule colts and a saddle.  For the
fees so secured the Pindalls, in part performance of their con-
tract, sued out a writ of habeas corpus, and caused Schmidt to
be admitted to bail in the sum of $5,000, and his discharge from
imprisonment.  In two days thereafter Schmidt was found dead,
hanging by the neck in his barn.  He died intestate, leaving H.
J. Schmidt his only son and heir surviving.  Gus Waterman was
appointed the administrator of his estate.

    H. J. Schmidt, heir, and Gus Waterman, as administrator
of J. J. Schmidt, deceased, brought suit in the Desha Chancery
Court against E. S. Pindall and X. O. Pindall to set aside the
note and mortgage executed to E. S. Pindall, and, among other
things, state as follows:

    "Plaintiffs say at the time the defendants procured said
Schmidt's signature to said note and mortgage said Schmidt
was not indebted to said E. S. Pindall in any sum.

    "Plaintiffs say that at the time defendants procured the sig-
nature of said Schmidt to said note and mortgage said Schmidt
was insane, and by reason of his insanity was incapable of en-
tering into a valid and binding contract.

    "Plaintiffs say that plaintiff H. J. Schmidt is the owner in
fee simple of said land, subject to such interest as his co-plain-
tiff may have therein for the purpose of administration.

    "Plaintiffs say that defendant E. S. Pindall is a practicing
attorney at law; that at the time defendant procured said note
and mortgage from said Schmidt the latter was confined in the
jail of Desha County, upon a charge of murder in the first de-
gree; that defendant claims that he was employed by said
Schmidt to defend him upon said charge in all the courts to
which same might be carried, and that property was delivered
to him in payment for services to be rendered.  Plaintiffs say
that the only service which defendant rendered said Schmidt was

in appearing before the county judge of Desha County in habeas corpus proceedings by which Schmidt was granted bail in the sum of five thousand dollars; that within two days after executing said bail and being released from jail said Schmidt died, committing suicide by hanging himself.

"Plaintiffs say that by reason of the death of said Schmidt the service to be rendered which defendant claims is the consideration for which said note and mortgage were delivered to him cannot be performed, that said consideration has failed, and that defendant has not given nor can he give any consideration for said sum; that if defendant's claim that said note and mortgage were delivered to him under contract be true, defendant is not entitled to retain nor enforce same, because said contract is now impossible of performance.

"Plaintiffs further say that at the time at which defendant claims to have entered into said contract with said Schmidt the latter was insane, and by reason of his insanity could not make a valid and binding contract; that said contract is null, and that defendant acquired no lien on said property thereby."

The defendant E. S. Pindall answered in part as follows:

"The defendant denies that the note and mortgage to him was without consideration, and says that at the time it was made the defendant Schmidt employed said E. S. Pindall and X. O. Pindall to defend him on the charge of murder in the first degree, and state that this defendant, and X. O. Pindall, his co-defendant, are attorneys at law, practicing in the courts of Desha County, and in other counties of the State and in the Supreme Court of the State of Arkansas.

"Defendant denies that the said Schmidt at the time of executing the note and mortgage was insane, and therefore incapable of entering into a valid and binding contract.

"Defendant, further answering, pleads the truth of this matter to be as follows: Said Schmidt, being charged with the crime of murder in the first degree, and arrested on said charge, employed this defendant, who is an attorney at law, as stated, as one of his attorneys to defend him; that it was expressly agreed between this defendant and the said Schmidt that this defendant's retainer should be $5,000, and said Schmidt executed the note and mortgage in question as payment, and security for

payment of said sum, the contract being thereupon consummated; this defendant entered into the discharge of his employment, and has performed all the services required of him under said employment; that the note and mortgage belong to this defendant."

In this case the court found that the allegation of insanity was not sustained; that by the death of Schmidt the consideration of the note and mortgage had failed, but that E. S. Pindall had received no compensation for his services in the habeas corpus proceedings, and that such services were reasonably worth $500; that E. S. Pindall was indebted to the estate of Schmidt for the occupation of the residence of the deceased in the sum of $72, and ordered and decreed that plaintiff pay to him (E. S. Pindall) the sum of $428, and upon payment thereof that E. S. Pindall cancel the mortgage on record, and deliver the same and the note to plaintiffs.

Gus Waterman, as administrator of the estate of J. J. Schmidt, deceased, also brought a suit in the Desha Chancery Court against X. O. Pindall to enjoin him from assigning and disposing of the property delivered to him by Schmidt and the Bank of Dumas from entering upon its books any assignment of the stock transfer to the defendant, and the Dumas Mercantile Company from paying its said note, and, upon final hearing, to require the defendant to deliver to plaintiff said note, stock certificate, and five hundred dollars delivered to him by Schmidt; and for reasons for so asking made substantially the same allegations as are contained in the complaint in the suit brought by H. J. Schmidt, heir, and Gus Waterman, as administrator.

The defendant X. O. Pindall, answering, denied "that he has in his custody money and chattels belonging to the estate of J. J. Schmidt, the deceased, as alleged; denies that the title to said property was in J. J. Schmidt at the time of his death; denies that at the time the defendant procured possession of said property from the said Schmidt the said Schmidt was insane and therefore incapable of making a valid and legal contract; admits that defendant is a practicing attorney at law, and that at the time he procured said property from said Schmidt

the latter was confined in the Desha County jail on charge of murder in the first degree.

"This defendant says that he is a lawyer practicing at the bar of Desha County and other counties in the State of Arkansas, and the Supreme Court of the State of Arkansas; that the said Schmidt was charged with the commission of the crime of murder in the first degree, and arrested on said charge and incarcerated in jail; that he employed this defendant as one of his attorneys to defend him upon said charge upon an express consideration expressed in the contract at the time it was made and paid at the time, said consideration being promissory notes for $500, a certificate for forty shares in the Bank of Dumas, and $500 in money, and a draft on the Dumas Mercantile Company for $500; that this defendant has duly performed said contract upon his part, and holds nothing belonging to the estate of the said J. J. Schmidt in his hands."

In this case the court found that J. J. Schmidt, prior to his death, paid X. O. Pindall $500 in cash, and delivered to him the promissory notes and bank stock described in the complaint for services to be rendered in defending him against charges for killing Willis; that the allegation as to the insanity was not sustained by the evidence; that the performance of the contract of Schmidt and Pindall "had become impossible of performance;" and that the $500 paid Pindall in cash was full and adequate compensation for all services rendered Schmidt by him; and ordered and decreed that defendant Pindall deliver to plaintiff the notes of Dumas Mercantile Company for $500, the certificate for forty shares in the Bank of Dumas, and the note executed by Schmidt to Pindall for $500; and ordered and decreed that the Dumas Mercantile Company and the Bank of Dumas be restrained and enjoined as the plaintiff prayed for in his complaint.

Professor Page says: "Inadequacy of consideration may be found in connection with circumstances of oppression which do not amount to technical duress; and the combination may justify a finding of undue influence. Thus a transaction entered into under great mental distress, caused by domestic calamity, * * * will be relieved against in equity. The propriety of relief is especially clear if, under great mental distress due to

the death of her husband, the person seeking relief is induced by threats of violence to relinquish a legacy given her by her husband's will for an inadequate and nominal consideration. So a transaction entered into for an inadequate consideration, by taking advantage of the financial necessities of the party seeking relief, will be relieved against in equity." I Page on Contracts, § 228, and cases cited.

Mr. Freeman, in his notes to *Hough's Administrators* v. *Hunt,* 15 Am. Dec. 572, says: "There is a large class of cases in which courts of equity will rescind contracts, which are against some public policy, where an unconscientious advantage has been taken, by one of the parties, of the condition or circumstances of the other party, when there is gross inadequacy of consideration, or when there has been imposition or oppression practiced upon a person who had reposed confidence in the party who had abused it. The ground on which a court of equity affords relief in such cases is, that while there may not have been any actual fraud practiced by either party to such contract, yet there has been a constructive fraud perpetrated upon the party to the contract, who, from any cause, may not have stood upon an equal footing with the person with whom he has contracted."

In *Robinson* v. *Sharp,* 201 Ill. 86, 92, while the relation of attorney and client existed, the court did not place its judgment entirely upon that ground. The court said: "That the appellees, in entering into the agreement to pay one-half of the insurance money to the appellant, were actuated by serious apprehensions as to the possibility or probability of collecting any thing thereon must be admitted. The chancellor believed, from the proof, that such apprehensions were aroused by the appelland. That there was ground for such fear is beyond question, and there is nothing in the evidence to show that appellant had any reason to believe, or did believe, that any litigation or contention would arise to prevent, or even delay, the collection of the policies. The amount contracted was clearly oppressive and unjust, and the chancellor correctly ruled that appellees should be relieved from the obligation of the contract, and that appellant was entitled to a reasonable compensation for the service performed."

In *Kelley* v. *Caplice,* 23 Kansas, 474, the syllabus is as fol-

lows: "On June 11, 1875, C. was indebted to K. & M. in the sum of $600; at the time C. had in his possession an endowment policy issued by an insurance company, insuring his life in favor of his wife. In consideration of the satisfaction of this ndebtedness and $275, C. and his wife executed a written assignment of the policy to M., and delivered the policy and assignment to him, and thereby transferred all their right, title and interest in the policy. Afterward M. paid to the company all subsequent premiums and premium notes. The policy matured May 12, 1878. The amount due thereon was $1,477.73. K. & M. demanded this sum from the insurance company, but it refused to pay without Mrs. C.'s receipt on the back of the policy. Mrs. C. refused to sign her name unless she was paid $477.73 when the policy was collected. In compliance with this extortionate demand, K. executed to Mrs. C. his written promise to pay to her this sum on the payment of the policy, and M. guarantied the payment of the money within ten days after the policy was paid. When the policy was paid, K. & M. refused to comply with their written promise, Mrs. C. brought her action thereon, and the court gave her judgment for the full amount, interest and costs. *Held,* that as Mrs. C. availed herself of the situation in which K. & M. were placed to exact an unreasonable sum and an unconscionable bargain, she can not enforce their written promise, but may recover what is fairly due her for the inconvenience, or service in writing her signature."

The court said: "The mind revolts at the enforcement of such a promise, and as the courts, as a rule, under such circumstances seize upon the slightest act of oppression or advantage to set at naught a promise thus obtained, we are of opinion that Mrs. C. is only entitled to what may be fairly due her for writing her signature, and that she cannot recover on the agreement."

In this case Schmidt was a man about sixty years of age. He was sober, industrious and penurious, and accumulated an estate of the value of about $8,089.60. He killed a man; was charged with murder in the first degree. The excitement caused by it was very high, and mob violence was threatened and feared. He was arrested and imprisoned. On account of the excitement and trouble experienced by him, he grew haggard and worn

and at times looked dazed and unconscious of what he was doing. In this condition E. S. and X. O. Pindall, two lawyers, together visited him, presumably at his invitation, and received from him as security and payment for fees property worth about $7,000, and his note for $500, leaving property worth only $1,089.69. In a few days thereafter, to relieve himself of the troubles and excitement then torturing him, he ended his life by suicide. Property and life ceased to have any value with him, although before that time he had been penurious. While in this condition, the Pindalls received of him what, in the absence of an explanation, seems to be unreasonable, oppressive and exorbitant fees and promises to pay fees, which come within that class of transactions against which equity will relieve. No effort to explain or show that the fees were fair and reasonable was made. They alleged that they made the contracts, and have at all times been ready to perform the service they contracted to render. This is their defense. It is not sufficient.

Decrees in both cases affirmed.