## Chreste v. Louisville Railway Company.

(Decided November 30, 1915.)

Appeal from Jefferson Circuit Court.
(Common Pleas No. 1).

1. Attorney and Client—Contract of Employment—Effect of Solicitation.—Mere solicitation on the part of an attorney, unaccompanied by fraud, misrepresentation, undue influence or imposition of some kind, or other circumstances sufficient to invalidate the contract, is not of itself sufficient to render a contract between an attorney and client void on the ground that it is contrary to public policy.

2. Attorney and Client—Lien on Judgment—Extent.—Where an attorney prosecutes a suit to judgment, a solvent judgment debtor cannot, in the absence of the creditor's attorney, settle with the judgment creditor for less than the amount of the judgment and deprive the attorney of any portion of the fee to which he is en-

titled under and by virtue of his contract of employment, but is liable for the whole of such fee.

EDWARDS, OGDEN & PEAK for appellant.

FRANK P. STRAUS and HOWARD B. LEE for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER.—Reversing.

Henry B. Drake, while a passenger on the line of the Louisville Railway Company, was injured. Through his attorney, Robert A. Chreste, he brought suit to recover damages. The trial resulted in a verdict and judgment in his favor for $1,000.00. Chreste had a written contract with Drake, by which the latter agreed to pay Chreste a fee equal to 50 per cent. of the amount recovered on his claim. After the motion for a new trial was overruled, the railway company employed L. C. Sherrick to settle with Drake, the company agreeing to pay Sherrick $175.00 if he would secure a settlement with Drake for $300.00. Sherrick agreed to pay Drake $125.00 of the amount received by him. Thereupon the settlement was made, Drake receiving $300.00 from the company and $125.00 of the $175.00 paid by the company to Sherrick. At the same time Drake signed a contract releasing the company from all liability, and the company endorsed on the release an agreement to pay Chreste his fee.

Thereafter Chreste, by intervening petition, sought to enforce against the railway company the statutory lien for his fee under his contract with Drake. The company answered in two paragraphs. By paragraph 1, it pleaded that it had settled with Drake in full for the sum of $300.00. This paragraph was stricken out by the trial court, on the ground that if Chreste was entitled to recover at all, he was entitled to recover an amount equal to fifty per cent. of the judgment, or $500.00.

By paragraph 2, the railway company pleaded that Chreste's contract with Drake was procured solely through the persuasion and solicitation of an agent employed by Chreste, and that the contract was champertous, against public morals and public policy and null and void. A demurrer to this paragraph was overruled. Thereupon Chreste filed a reply, denying the facts therein alleged. The only issue submitted to the jury

was whether or not the contract was obtained by solicitation. On this issue defendant's evidence was to the effect that the contract of employment was obtained three or four days after the accident, at the suggestion and through the solicitation of one Sherrick, a representative of plaintiff. On the other hand, plaintiff's evidence tends to show that Drake intended all along to employ plaintiff and that the contract was not entered into as the result of any suggestion or solicitation on the part of Sherrick. The jury found that the contract was obtained by solicitation. Thereupon the trial court entered judgment in favor of the railway company. Chreste's motion for a new trial and for a judgment *non obstante veredicto* being overruled, he appeals.

Other questions are presented, but we proceed to the main question, and that is: Is a contract between a lawyer and his client, obtained by solicitation on the part of the lawyer, valid, or is it contrary to public policy and, therefore, void?

The distinction between solicitors or attorneys, and counsel or barristers, under the English law, as to the right of compensation for services, does not prevail generally in the United States, and the employment of counsel is held not to differ in its incidents, or in the rules governing it, from the employment of an agent in any capacity or business. Mellon v. Fulton, 22 Okla., 636, 98 Pac., 911, 19 L. R. A. (N. S.), 960, 2 R. C. L., page 1032, sec. 114. Before an attorney undertakes the business of a client he may contract with reference to compensation for his services, as no confidential relation then exists and the parties deal with each other at arm's length. A contract made under such circumstances is as valid and unobjectionable as if made between other parties not occupying fiduciary relations, and who are, in all respects, competent to contract with each other. Such a contract will be enforced, unless champertous, or contrary to public policy, or unless induced by fraud or misrepresentation, or unless, in view of the nature of the claim, the compensation is so excessive as to evince a purpose on the part of the attorney to obtain an improper or undue advantage over the client; and the attorney, as a condition of enforcing the contract, is not bound to show that it was just, fair and reasonable, as is often held to be his duty in case of contracts made after the inception of the relation of attorney and client. Elmore

v. Johnson, 143 Ill., 513, 32 N. E., 413, 36 A. S. R., 401, 21
L. R. A., 366; Dickinson v. Bradford, 59 Ala., 581, 31 Am.
Rep., 23; Shirk v. Neible, 156 Ind., 66, 59 N. E., 281, 83
A. S. R., 150; Rust v. Larue, 4 Litt. (Ky.), 412, 14 Am.
Dec. 172; Morehouse v. Brooklyn Heights R. Co., 185 N.
Y., 520, 78 N. E., 179, 7 Ann. Cas., 377; Pindall v. Water-
man, 84 Ark., 575, 106 S. W., 964, 120 A. S. R., 87; 2 R.
C. L., page 1036, sec. 120.   Furthermore, there is no law
prohibiting an attorney from contracting with his client
respecting his fees, and such contracts when fairly made
will be enforced, but in determining the validity and
conclusiveness of contracts for compensation thus en-
tered into after the commencement of the relation of at-
torney and client the general rule applies that all trans-
actions between an attorney and his client will, by reason
of the confidential nature of the relation, be closely
scrutinized by the courts, and are often declared to be
voidable when they would be deemed unobjectionable be-
tween parties not sustaining the relation of attorney and
client.   Dickinson v. Bradford, *supra*; Ware's Admr. v.
Russell, 70 Ala., 174, 45 Am. Rep., 82; 2 R. C. L., page
1037, sec. 120.

There are numerous classes of contracts between an
attorney and client which are held to be in contraven-
tion of public policy and, therefore, invalid and unen-
forceable, such as contracts for lobby services—Houlton
v. Nichol, 93 Wis., 393, 67 N. W., 715, 57 A. S. R., 928,
33 L. R. A., 166; Weed v. Black, 2 MacArthur (D. C.),
268, 29 Am. Rep., 618; McBratney v. Chandler, 22 Kan.,
692, 31 Am. Rep., 213; Stroemer v. Van Orsdel, 74 Neb.,
132, 103 N. W., 1053, 107 N. W., 125, 121 A. S. R. 713,
4 L. R. A. (N. S.), 212—or for service to obstruct or
prevent the administration of justice—Weber v. Shay,
56 Ohio St., 116, 46 N. E., 377, 60 A. S. R., 743, 37 L.
R. A., 230; Ormerod v. Dearman, 100 Pa. St., 561, 45 Am.
Rep., 391—or for services in procuring liberation or par-
don of convicts—Hatzfield v. Gulden, 7 Watts (Pa.), 152,
31 Am. Dec., 750, 2 R. C. L., page 1043, sec. 124—or for
services affecting marital relations, such as an agreement
to obtain a divorce in consideration of a certain por-
tion of the alimony awarded—McConnell v. McConnell,
98 Ark., 193, 136 S. W., 931, 33 L. R. A. (N. S.), 1074
and note, 2 R. C. L., page 1044, sec. 125; or contracts
in restraint of settlement or compromise by client—
Burho v. Carmichiel, 117 Minn., 211, 135 N. W., 386, Ann.

Cas., 1913D, 305; 2 R. C. L., page 1044, sec. 126. In addition to the foregoing, it is generally held that a contract between an attorney-at-law and a layman, by which the latter agreed to solicit business for the former in consideration of a share of the fees, is void as against public policy. Alpers v. Hunt, 86 Cal., 78, 9 L. R. A., 483, 21 Am. St. Rep., 17, 24 Pac., 846; Langdon v. Conlin, 67 Neb., 243, 60 L. R. A., 429, 108 Am. St. Rep., 643, 93 N. W., 389; in re Clark, 184 N. Y., 222, 77 N. E., 1, Affirming 108 App. Div., 150, 95 N. Y. Supp., 388. These decisions are based either on statutes providing for disbarment of attorneys who lend their names to be used in legal proceedings by persons who are not attorneys, or forbidding the promise or gift of a valuable consideration to any person as an inducement to placing a claim for prosecution in the hands of an attorney, or upon statutes clearly showing a legislative intent to provide that no persons other than licensed attorneys shall receive fees for legal services. In none of these cases was the question of solicitation involved and in one of them at least (in re Clark, *supra*), the court apparently admits "that the law permits attorneys to solicit business."

We have been able to find only one case tending to sustain the doctrine that contracts obtained through solicitation are contrary to public policy and void, and that is the case of the Ingersoll v. Coal Creek Coal Co., 117 Tenn., 263, 98 S. W., 178, 119 A. S. R., 1003, 10 Ann. Cas., 829, 9 L. R. A. (N. S.), 282. In that case the facts were these: Several persons were injured or killed in an explosion which occurred at the Fraterville mine. A representative of the law firm of Ingersoll & Peyton went to the scene of the disaster and actively solicited parties having rights of action against the company, growing out of the explosion, to intrust their cases to the firm of Ingersol & Peyton. He saw a number of widows and others whose husbands and next of kin had been killed in the explosion, and sought, as other lawyers were doing, to obtain contracts authorizing his firm to bring suits. He made several trips to the scene of disaster for that purpose and secured about 40 cases for his firm. About 150 other cases were secured by other lawyers who were there for the same purpose. The representative obtained written contracts from the parties and these contracts stipulated that the firm was to receive a certain specified per cent. of the recovery obtained in each case. After the

suits were filed on the contracts, the defendant settled with plaintiffs by paying about $320 in each case. Messrs. Ingersoll and Peyton then brought suit to recover their fees of the defendant. The chancery court found in favor of plaintiffs. On appeal to the Court of Chancery Appeals, the decree was affirmed. On appeal to the Supreme Court the judgment was reversed. In discussing the question the court said:

"We cannot agree to several propositions advanced by complainants. We cannot agree that in these latter years a spirit of commercialism has lowered the standard of the legal profession. We cannot agree that the practice of law has become a 'business' instead of a 'profession,' and that it is now allowable to resort to the practices and devices of business men to bring in business by personal solicitation, under the facts shown in this case.

"As to how far an attorney may go in soliciting business, or whether he may solicit at all, we are not called upon to decide; but when such a case is presented, as is disclosed in this record, of attorneys rushing to the scene of disaster in hot haste, and competing with each other in soliciting the bereaved ones to allow them to sue for their losses, we feel that we are called upon to say in no uncertain terms that such conduct is an act of impropriety and inconsistent with the character of the profession. We cannot, we dare not, lower the standard of the legal profession to that of a mere business, in which fleetness of foot, or the celerity of the automobile, determines who shall be employed.

"The miserable victims of the disaster are dazed by the terrible bereavement. They are in no condition to consider their rights to damages. In their extremity, they fly to anyone promising relief, when, if left to time and more mature consideration, they would be enabled to make, perhaps, a better choice. In addition, it is unbecoming a member of the profession, and a public scandal, and when he bases his right to recover fees upon such improper conduct, and lowering the character of the profession and the court, it is no excuse that other attorneys do the same; but this is rather a reason why this court should act promptly and decidedly, in order that an end may be put to the practice.

"It is no excuse that corporations which have caused such disasters have been alert to send their agents and

representatives to the scene, with a view of forestalling
suits and making favorable compromises. This court
has never failed to condemn this practice in the strong-
est terms; and, whenever a case has come before it which
in any way smacked of fraud or undue advantage aris-
ing out of such conduct, this court has not been slow to
disregard or set aside improper or hard settlements. But
such agents of corporations are not, as a rule, officers
of the court, nor do they occupy that high status which
the law places the attorney upon; and we think that we
can safely say that, if any attorney should make such
settlement, under such circumstances, this court would
not hesitate to disbar him.

''It is said that there is no precedent for refusing
fees because of such conduct. If this be so, we are ad-
monished by the record in this case that it is high time
that such a precedent be set, and on such terms as may
not be mistaken or misunderstood.

''The arguments made in this case, that such practice
is not looked upon with disfavor by many members of
the profession, that it is freely indulged in by promi-
nent lawyers, that it is necessary to successful practice,
and that the Court of Appeals, while deprecating the
practice, does not condemn it—these and other argu-
ments call for a full and emphatic expression from this
court in this case.''

It will be observed that the court declined to pass
on the question whether or not an attorney could solicit
business, but based its conclusion solely on the particular
facts of the case, which the court held showed acts of
impropriety inconsistent with the character of the pro-
fession and incompatible with the faithful discharge of
its duties. In other words, the case is not authorty for
the position that contracts obtained by solicitation alone
are contrary to public policy, but is authority for the
position that contracts obtained by solicitation from per-
sons, who, because of their great bereavement, are in no
condition to consider their rights, are contrary to pub-
lic policy. Of course, where the circumstances tend to
show that a contract of employment was obtained by
fraud or misrepresentation, undue influence or imposi-
tion of any kind, an entirely new element is introduced
into the case, which, regardless of the question of solici-
tation, would of itself be sufficient to avoid the contract
as between the parties. In the case under consideration

there is no claim that the contract of employment was obtained by such means. Therefore, we have to deal only with the question of solicitation. As before stated, we have been unable, in rather an extensive research, to find a single case holding that solicitation alone renders a contract of employment invalid. On the contrary, we find some authorities holding adversely to such contention. Thus in Dunne v. Herrick, 37 Ill. App., 180, it was held that a contract to pay an attorney one-half of the amount recovered for personal injury was valid and binding on the injured party, and she could not recover from the attorney more than one-half of the amount collected by him, although it appeared that his clerk solicited the injured party to put the claim in the attorney's hands. In Bunn v. Guy, 4 East, 190, a practicing attorney, by the name of Carpenter, agreed, for a valuable consideration, to relinquish and turn over his business and recommend his clients to two other attorneys by the name of Bunn and Guy. The question arose in chancery concerning the marshaling of assets, and a case stating the above contract was sent by the lord chancellor to the court of king's bench for its opinion. That court held the contract valid. This ruling was followed in Candler v. Candler, Jacob, 225, in an opinion by Lord Eldon. He, while expressing his pleasure over the fact that the court of king's bench had so decided, adds that he never could entirely reconcile himself to the doctrine.

Public policy is a variable quantity. It varies with the habits, capacities and opportunities of the public. It often changes as the laws change, and, therefore, new applications of old principles are required. A contract is not void as against public policy unless it is injurious to the public or contravenes some established interest of society. The public policy of a state is determined by its Constitution and Statutes, and, where these are silent, by the decisions of its courts. Davies v. Davies, L. R., 36 Ch. Div., 359; Brooks v. Cooper, 50 N. J. Eq., 761, 21 L. R. A., 617, 35 Am. St. Rep. 793; Union Cent. Life Ins. Co. v. Spinks, 119 Ky., 261, 83 S. W., 615, 69 L. R. A., 264, 7 Ann Cas., 913. The varying views of the courts on the question of public policy led Mr. Justice Burrough, in Richardson v. Mellish, 2 Bing., 229, 252, to remark that public policy "is a very unruly horse, and when once you get astride it you never know where it will carry you." For this reason, it is the general rule that courts

should hold themselves bound to the observance of extreme caution when called upon to declare a transaction void on the ground of public policy and prejudice to the public interest. Atlantic Coast Line R. Co. v. Beazley, 45 South, 761, 54 Fla., 311; Warren v. Bouvier, 124 N. Y. Supp., 641, 68 Misc. Rep., 159. We find no provision of the Constitution, or of our Statutes, that directly or indirectly forbids an attorney from soliciting business. We find no decision of this court holding that such a contract is contrary to public policy. For the first time we are called on to deal with the question. In deciding every case, courts should project themselves into the future and anticipate, if possible, the probable consequence that will follow their decisions.

There are many forms of solicitation. Some lawyers seek business by advertising in the newspapers; others by sending out announcement cards; others by asking their friends to send them business; others by applying directly, or through the medium of friends, for employment by firms and corporations; others buy stock in corporations, with the understanding that they are to be employed as counsel; still others invite to their homes and frequently entertain those who are likely to require the services of an attorney. Doubtless many solicit business in person, or through young lawyers or agents employed for that purpose. Manifestly, if every kind of solicitation, regardless of the form it may take, is to be condemned, then only in rare instances would there be such a thing as a valid contract of employment between a lawyer and his client. If some forms are to be permitted, while others are to be condemned, where shall the line be drawn? We recall one case where some parties visited an old lawyer and asked him what they should do. He replied that they ought to employ a lawyer. Thinking that the case was too small for him to take, they asked him to recommend a laweyr. He replied: "I will be glad to attend to the matter for you." On which side of the dividing line would such solicitation fall? If it be lawful for an attorney to send out announcement cards, or insert an advertisement in the newspaper, or buy stock in a corporation, with the understanding that he is to be employed as counsel, or ask his friends to recommend him for employment by firms or corporations, how can it be said that if he solicits business in person, or by an agent, that the public interest will be so endangered that

any contract obtained under such circumstances will be contrary to public policy? In saying this, we are not unmindful of the fact that what is usually termed "ambulance chasing" does not comport with the highest ideals of the profession. We do not wish to be understood as sanctioning such conduct. On the contrary, we take advantage of this occasion to express our unqualified disapproval of this method of obtaining law business. But it must be remembered that there is a wide difference between what is undignified or unbecoming conduct on the part of an attorney and what is clearly contrary to public policy. Such conduct may be disapproved of by the courts and by those representatives of the profession who are concerned in seeing that its standards are never lowered, and, yet, it may fall far short of being so injurious to the interest of the public as to invalidate a contract of employment thus obtained. While such conduct may sometimes result in the employment of the unworthy, the consequences that would follow the rule that mere solicitation is contrary to public policy would frequently be antagonistic to the public interest, in that it would prompt solvent firms or corporations to make unfair settlements, in the absence of counsel, in the hope that the fee of the attorney might be defeated by a plea that the contract of employment was obtained by solicitation.

Considering the difficulty of fixing the dividing line between what is proper and improper solicitation, the uncertainty that the doctrine would introduce into all contracts between attorneys and their clients, the fact that solicitation is not condemned at common law or denounced by our Constitution or Statutes, and the further fact that it is difficult to perceive upon what theory it can be said to be clearly injurious to the public good, we conclude that mere solicitation on the part of an attorney, unaccompanied by fraud, misrepresentation, undue influence or imposition of some kind, or other circumstances sufficient to invalidate the contract, is not of itself sufficient to render a contract between an attorney and client void on the ground that it is contrary to public policy. It follows that the second paragraph of defendant's answer presented no defense and that the demurrer thereto was improperly overruled.

The next question is: How much is plaintiff entitled to recover of the railway company?

Section 107 of the Kentucky Statutes is as follows:

"Attorneys-at-law shall have a lien upon all claims or demands, including all claims for unliquidated damages put into their hands for suit or collection, or upon which suit has been instituted, for the amount of any fee which may have been agreed upon by the parties, or, in the absence of such agreement, for a reasonable fee for the services of such attorneys; and if the action is prosecuted to a recovery, shall have a lien upon the judgment for money or property which may be recovered—legal costs excepted—for such fee; and if the records show the name of the attorney, the defendant in the action shall have notice of the lien; but if the parties before judgment, in good faith, compromise or settle their differences without the payment of money or other thing of value, the attorneys shall have no claim against the defendant for any part of his fee."

This is not a case where settlement was made with the client prior to judgment; nor is it a case where the judgment debtor is insolvent. It is a case where there was a judgment for $1,000.00 and a solvent judgment debtor settled with the plaintiff for $300.00. In such a case, the amount of the judgment, and not the amount of the compromise, controls. In other words, if the judgment debtor settles with the judgment creditor, in the absence of the creditor's attorney, for less than the amount of the judgment, he does so at his peril and cannot thereby deprive the attorney of any portion of the fee to which he is entitled, under and by virtue of his contract of employment. L. & N. R. R. Co. v. Proctor, 21 R., 447; Gray v. Graziani, et al., 165 Ky., 771. As Chreste's contract between him and Drake called for a fee equal to 50 per cent. of the amount of recovery, and as Drake recovered a judgment for $1,000.00, it follows that Chreste is entitled to recover of the railroad company one-half of the amount of the judgment, or the sum of $500.00.

Judgment reversed and cause remanded for proceedings consistent with this opinion.

Whole court sitting.