OFSTAD, Appellant, v. BECK, Respondent.

(274 N. W. 498)

(File No. 8012.   Opinion filed July 9, 1937)

*Danforth & Davenport,* of Sioux Falls, and *Harold M. East-vold,* of Canton, for appellant.

*McInerny & Beck,* of Elk Point, for Respondent.

SMITH, J. Plaintiff brought this action for the purpose of avoiding, as unfair and unconscionable, a contract in writing executed between himself and defendant on April 11, 1933, dealing with the compensation of defendant for legal services performed, and to be performed, by defendant as plaintiff's attorney. The trial court made and entered findings of fact, conclusions of law, and judgment for defendant, and thereafter denied a motion for a new trial. The appeal is from the judgment and the order overruling the motion for a new trial. Under appropriate assignments,

plaintiff questions the sufficiency of the evidence to justify the findings.

The record discloses the following uncontroverted facts: Defendant is a duly licensed and practicing attorney at law, maintaining an office at Alcester, S. D. In 1932, plaintiff, then about forty-two years of age, was engaged in the business of farming as a tenant, and had limited means. In 1925, an insurance company delivered to plaintiff a policy insuring his life for $5,000, which policy contained provisions for an annual premium of $131.-05, and the payment of an income to plaintiff of $50 per month when he "* * * is disabled to such an extent that he is thereby wholly prevented from performing any work or engaging in any occupation whatsoever for remuneration or profit." The policy further provided for waiver of premiums during any periods of total disability. As against this policy, plaintiff had borrowed $440 from the company prior to April, 1932.

In 1932, plaintiff was suffering from asthma. Prior to February, 1932, he had received treatment for his ailment at the U. S. Veterans' Hospital at Kansas City, Mo., and, having made application to the Veterans' Bureau for a disability allowance, was advised by letter dated February 23, 1932, that no payments could be made to him by the government because he was not suffering from a disability permanent in nature or to a degree of 25 per cent. or 'more.

In the early days of February, 1932, plaintiff had sought forms from the insurance company for use in presenting a claim for disability against it. The company responded by inclosing forms and calling plaintiff's attention to conditions of the policy dealing with total disability. It later requested, and received from plaintiff, authorization to secure details of plaintiff's condition from the Veterans' Hospital at Kansas City, and directed plaintiff to report to the Sioux Falls physician for his examination. This examination was had during March, 1932.

In April, 1932, plaintiff consulted defendant and turned over to him all correspondence theretofore had with the Veterans' Bureau and the insurance company, as well as the insurance policy. Defendant made immediate demand upon the insurance company. It responded by calling attention to the conditions of its policy

with reference to disability, and representations with reference to the health of the insured prior to the delivery of the policy. It claimed that the examination of March 28th by the company physician did not reveal total disability, but did reveal subjective symptoms. It also claimed that answers made by plaintiff in his claim indicated that he had suffered from a similar bronchial condition prior to the delivery of the policy, and that such condition had not been disclosed in his application. It indicated, however, that if certain conditions were met it would make an allowance for three months' disability. Thereafter, during the last of June, 1932, it did pay three months' disability, but stated "In view of the information we have, we are of the opinion that the above benefits are all to which the insured is entitled under his claim." It refused to return any of the premium theretofore paid.

During the next period of months, defendant made demands upon the insurance company, carried on an investigation with reference to plaintiff's condition and his ailment, and made arrangements for further medical examinations. In an interview with a representative of the insurance company had during October or November of that year, an offer of $1,940 less the amount of the policy loan was made as consideration for a surrender of the policy. After conference with plaintiff, this offer was rejected, and during January, 1933, suit was commenced against the insurance company for $598.89 including the amount accrued for claimed disability payments, an amount equal to the pro rata rate of premium claimed under the policy condition for premium waiver, and an amount claimed as due on dividends. The company answered, denying the disability. In April, just before the case was to be tried, and after several conferences, a stipulation of settlement was entered into between the insurance company and plaintiff through their respective attorneys, under which the company paid to plaintiff $741.65. This stipulation was so framed, however, as to make it clear that the company did not admit disability. After further correspondence between the company and defendant, and during June, 1933, the company commenced making regular disability payments. Up to the time of trial of this action, the company had continued such payments, and was performing its agreement to waive premiums during disability. Some of these payments were

made directly to plaintiff, and others were mailed to plaintiff in care of defendant.

Plaintiff paid to defendant $50 of the original $150 paid by the company to plaintiff, and $10 expense money at the time the action was commenced. The draft for $741.65 was indorsed by plaintiff, and was deposited by defendant in his account for collection. Defendant kept and retained one-third of that amount, and paid to plaintiff the remaining two-thirds, or $494.44. As subsequent payments were made, plaintiff paid one-third thereof to defendant.

On April 11, 1933, and at the time of payment to plaintiff of the above-described sum of $494.44, the parties entered into the contract in writing now at issue whereunder plaintiff agreed to pay to defendant, as compensation for his services theretofore rendered and to be rendered, an amount equal to one-third of all amounts that he should receive under the policy, except that defendant was to receive only $200 at the time any amount was to be paid by the company by reason of the death of the plaintiff. By the terms of this contract, defendant was bound to represent plaintiff in all future actions brought under the terms of the policy, and provision was made therein for retention of the policy by the defendant. The parties abided by the terms of this contract until March, 1935, although plaintiff made complaints with reference to its terms starting in December, 1933, and commenced this action in August, 1934.

During this same period of time, the defendant assisted plaintiff in establishing his claim before the Veterans' Bureau. He was first granted a 25 per cent. disability; later this was raised to 75 per cent., and later to 100 per cent. Plaintiff offered defendant some payment for this service, but defendant informed plaintiff that he was not allowed to make a charge for such service and would make no charge for the same.

The record does not disclose plaintiff's representations to defendant as to his physical condition, but one of the letters turned over to defendant at the inception of his employment contains the following statements: "I am unable to do any labor on account of asthmatic attacks and also have attacks at night which tire me out through lack of sleep. I have wheezing and coughing spells

that choke me. I am unable to eat only certain kinds of food. When I eat certain foods I have giant hives which swell up all over my body. I have been in this condition ever since spring."

Defendant represented to plaintiff that his case was rendered difficult for the reason that plaintiff was farming at the time, and was actually managing a farm. Defendant further explained that the language of the policy had not been passed upon by the Supreme Court of South Dakota, but had been passed upon by the Supreme Court of Iowa, and that under the Iowa rule "a man would pretty near have to be flat on his back." Defendant admitted that under the rule followed by the majority of the courts of last resort in construing the language used in this policy it only would be necessary for plaintiff to show that he could not carry on his usual occupation, in order to establish permanent disability.

We now enter the field of controversy. Defendant testified that when plaintiff first came to him he inquired as to plaintiff's financial status, and that plaintiff informed him that: "* * * he was unable to do any work of any kind; that he was the owner of some personal property; that he had borrowed practically the limit on the insurance policy, and that he would be unable to keep up the premiums on it and would eventually lose it unless his disability could be established and the premiums waived."

Defendant further testified: "* * * at that time we mentioned the question of fees, and I asked him how he wanted to handle the case, and he told me that he could not pay, except on a commission basis, and I told him that it would be satisfactory with me to handle it in that manner. At that time I also told him that my fee would be all the way from a third to fifty percent of the amount which would be paid under the terms of the policy, if we were successful in establishing the disability benefits. I said that I was not able to fix it any closer than that, because I didn't know exactly what I would have to do, and then he said that that would be perfectly satisfactory with him, and I think he made the statement, 'I know you will treat me right.' "

Later, when the draft for $150 was received from the company, defendant testified that he told plaintiff, "I have decided to charge you only a third."

Defendant testified to the following conversation at the time

of the execution of the contract in question: "At that time I told Mr. Ofstad that I thought that the case was practically won and that we had gone a long ways to establish disability under the policy. I also told him that I was not sure what the company would do, and then, after we had talked a while, I made this statement to Mr. Ofstad: I said 'Alfred, don't you think we ought to put our agreement in writing?' He was hurt a little bit. He said, 'My word is good; you don't have to have anything in writing; you can depend on me,' and I said, 'I don't mistrust you, but I believe that our agreement ought to be in writing. Then if anything happens to either one of us they know exactly what agreement we had.'"

At this time the original draft of the agreement was drawn, and this further conversation was had, according to the testimony of defendant: "* * * he read it over and after reading it over he said that 'under this agreement you will get a third of the five thousand dollars which will be paid under this policy when I die;' and I told him then, I said 'That was our agreement;' and he said 'I know that, but I would like to save that for my family.' 'Well,' I said, 'I will tell you what I will do. I am just going to cut that and I will agree that I am to have $200 only out of any amount paid under that policy in the event of your death.'"

The contract was thereupon changed so as to provide for such a $200 payment. According to the testimony of defendant, plaintiff read the contract, and defendant read it to him and discussed its provisions. The testimony of the defendant in reference to the conference at the time of the execution of the contract is corroborated by defendant's brother who was in the office at the time. According to the testimony of defendant and his brother, all of this conversation with reference to the written contract and the necessity therefor took place after defendant had paid to plaintiff $494.44 as his two-thirds of the settlement made by the insurance company.

Plaintiff gave the following testimony with reference to the talk of the parties about fees at the inception of their relationship; "* * * I asked, 'What do you want for this?' He says, 'We can let that go for a while and see how we come out.'" According to plaintiff, a further conversation was had about fees at the time of

receipt of the $150 from the insurance company as follows: "I asked him how much I owed him and he says, 'I would like to have fifty dollars at this time; that would be one-third of the check.' I asked him, 'Does this pay you up in full, or do I owe you any more, or does this pay you up in full and some to go on?' He says, 'Yes, this pays you up in full and some to go on.'"

Plaintiff testified to the following conversation just prior to the agreement in question: "Then I went down there Tuesday, that was the 11th, and he said, 'Well, I guess the check was all right.' He said, 'The money is here' and he told me to have a chair and I sat down on one side of his desk and him on the other, and he said 'I suppose you come to get your money.' I said 'Yes,' and he said, 'It might be all right to talk it over a little.' I said, 'How much do I owe you?' 'Well,' he says, 'It will be one-third of the check, and' he said, 'it might be all right to have a little writing done, something written down.' I says, 'Is it necessary to write that? Isn't my word good for it if I agree to give you that?' 'Oh, yes,' he said, 'Your word is good, but it is always best to have something written, * * *'" Then plaintiff testified to the following conversation and circumstances after the contract was written: "He come back and handed me those typewritten pages, and he said, 'I would like to have you read this over, and, of course, there is a place down there on the bottom,' he said, 'I would like to have you sign this.' I read it over once myself and I was quite upset. It was all quite a shock to me, and I was sick and nervous anyway. I could not figure out what all this was about. I read it over and I says, 'I am not a lawyer,' I says, 'I don't know much about this kind of business.' * * * I says, 'Is it all right for me to sign this?' and he said 'Yes, oh, yes, it is perfectly all right,' * * * I always relied on everything he told me and figured everything was for my best interest; * * * He said, 'Of course, if you don't sign, it will be more.'" Plaintiff further testified that he did not know he was signing a contract, and did not understand its contents. He admitted, however, that one paragraph was rewritten, according to his suggestion, so as to provide for only a $200 payment in case of death. Plaintiff testified that he did not receive the check for $494.44 until after the contract was signed.

It is significant that in plaintiff's complaint he alleges that defendant refused to deliver any money of any kind or character to the plaintiff unless the plaintiff would sign the contract in question, and that defendant concealed the contents and legal effect of the contract.

The court found that the parties entered into an oral agreement, at the inception of their relationship, under which defendant's compensation was fixed, upon a basis contingent upon the successful establishment of plaintiff's claim, at from one-third to one-half of the amount which would be paid under the policy, and that on April 11, 1933, for the purpose of having a written memorandum of the aforesaid oral agreement and in consideration of a reduction of the fees orally agreed upon, that the parties executed the written agreement at issue. It further found both agreements to be fair and reasonable under the circumstances, and that at the respective times plaintiff was free from duress, menace, or undue influence, and knew and understood the intention and legal effect of said agreements. It further found that defendant acted in the utmost good faith in his dealings with plaintiff.

Manifestly, these findings are binding upon us, and we may not disturb them unless it can be demonstrated that they are against the clear preponderance of the evidence.

At the outset, appellant contends that there was no agreement with reference to fees prior to the written agreement of April 11, 1933. The statement of the testimony heretofore made commands the conclusion that this contention is foreclosed by the findings of the trial court.

Appellant next contends that the provision in a contract made prior to the establishment of the relationship of attorney and client, and under the instant circumstances whereby the attorney is to receive a contingent fee of one-third to one-half of any amounts paid under the policy, is so unreasonable and unconscionable as to render the oral contract void. In this connection, he urges language used by this court in Egan v. Burnight, 34 S. D. 473, 149 N. W. 176, Ann. Cas. 1917A, 539, and Kickland v. Egan et al., 36 S. D. 428, 155 N. W. 192. The respective decisions in those cases rest squarely on the fact that the agreements for compensation were made during the existence of relationship of attor-

ney and client, and the rules announced therein have not been held by this court to apply to dealings between an attorney and one who is seeking his services. Prior to the establishment of the relationship of attorney and client, the dealings of the parties are uninfluenced by the confidence and trust which characterize, and serve as the very foundation of, that relation. They are then dealing at arm's length. A contract then negotiated, according to the weight of authority, stands before the law on the same basis as other contracts through which men customarily conduct business. One who attacks such a contract must prove that consent thereto was not free. 6 C. J. p. 735, § 309; 5 Am. Jur. p. 356, § 159. Appellant offered no such proof, and presents his contention upon the sole ground that the provision for compensation is unreasonable and unconscionable, and therefore unenforceable.

■ This contention is supported by authority and merits serious consideration. Pindall v. Waterman, 84 Ark. 575, 106 S. W. 964, 120 Am. St. Rep. 87; Chreste v. Louisville Ry. Co., 167 Ky. 75, 180 S. W. 49, L. R. A. 1917B, 1123, Ann. Cas. 1917C, 867; Morehouse v. Brooklyn Heights Ry. Co. et al., 185 N. Y. 520, 78 N. E. 179, 7 Ann. Cas. 377. While courts do not relieve parties from bargains in other fields for the sole reason that they have made a foolish or unwise agreement, more than the interests of the parties are at stake when an officer of a court is a party and the agreement is with reference to his services as such. We would be grossly derelict in the discharge of our highest duty if we disregarded the direct reflection upon the courts and the consequent loss of public confidence and trust in that most important institution of government which must inevitably result from any sharp or unconscionable dealings by its representatives as such. To provide what we regard as necessary and wholesome protection to the reputation of the courts and the bar, as well as to the interests of the public they serve, we align ourselves with those courts which hold that when a lawyer is bargaining with a prospective client, if the provision made for his compensation is so unreasonable and excessive, when viewed in the light of the circumstances of the particular case, as to evince a fixed purpose on his part to obtain an undue advantage over his prospective client, the contract should not, and will not, be upheld.

■■ We view the present situation in the light of this conclusion. Whether a particular provision for compensation is unreasonable or unconscionable under the particular circumstances is a question of fact to be determined by the trial court. Morehouse v. Brooklyn Heights Ry. Co., supra. That defendant made ample provision for himself through the oral contract in question is readily apparent. However, when plaintiff sought the assistance of defendant, according to testimony which the trial court was entitled to believe and evidently did believe, plaintiff and his family were about to lose the benefit of a $5,000 policy of insurance upon plaintiff's life unless his total disability could be established. At that time, the obstacles to the establishment of such a claim of total disability must have seemed almost insurmountable to both parties. According to this record, plaintiff was a farmer and was actively engaged in that occupation. He had been under close observation of the Veterans' Bureau and that Bureau had determined that his then condition would not justify a rating of even a 25 per cent. disability. This information was in the hands of the insurance company, and that company had in its policy protected itself by provision against liability for disability unless it could be shown that the insured was disabled to such an extent that he was wholly prevented from performing any work, or engaging in any occupation whatsoever, for remuneration or profit. From this discouraging situation, the services of defendant transported plaintiff to a position wherein, without the payment of annual premiums, he was assured of a monthly income and provision for the immediate needs of his family in case of his death. To accomplish this result, defendant gave some considerable portion of his time, thought, and energy for over a year. At the outset, under the circumstances, both parties could well have anticipated one or more sharply contested trials, and an appeal from any judgment favorable to the claims of plaintiff. In view of these circumstances, and of the fact that the parties were not purporting to contract with reference to the reasonable value of the services to the plaintiff, but were in fact thinking only of a speculative venture under which both parties only would secure benefit if their efforts were attended by success, we may not say that the finding of the court that the contract was reasonable under the circumstances was against the clear preponderance of the evidence.

We pass on to consider appellant's contentions with reference to the written contract. Appellant contends that the contract of April 11, 1933, was not in fact a mere record of the former agreement, but was a new and different agreement made during the existence of the relationship of attorney and client. The original agreement, appellant points out, made no provision binding plaintiff to avail himself of defendant's services in all future actions to be brought to enforce the policy.

Whether the agreement of April 11, 1933, constituted a new agreement replacing the oral agreement, or whether it was intended as a memorandum thereof, is not controlling. Appellant can only claim the assistance of the courts if the agreement of April 11, 1933, imposes burdens on him in addition to those contained in his original contract, and which additional burdens have resulted from the confidential relationship of the parties. Egan v. Burnight, supra. Analysis of its terms refutes such a contention. By the written agreement, the compensation to be paid is reduced, and the contract carries the implied agreement that the client at any time and without cause may dispense with the further services of the attorney. Ritz v. Carpenter, 43 S. D. 236, 178 N. W. 877, 19 A. L. R. 840.

Although other matters assigned have not been seriously argued, we have considered them and conclude that appellant has suffered no prejudice to his rights at the hands of the learned trial court.

The judgment and order of the trial court may be, and they are, hereby affirmed.

RUDOLPH, P. J., and ROBERTS and WARREN, JJ., concur.

POLLEY, J., dissents.