KICKLAND, Appellant, v. EGAN et al., Respondents.

(155 N. W. 192.)

(File No. 3778. Opinion filed December 18, 1915. Rehearing denied March 4, 1916.)

1. **Attorney and Client—Contract Between for Client's Residuary Interest, as Compensation—Finding—Sufficiency of Evidence— Voidness of Contract.**

    In a suit to recover as assets of an estate part of plaintiff's residuary interest therein, which part of said interest the defendant, an attorney, had contracted for as compensation for legal services and expenses in connection with the probate of the estate, involving the sustaining of a will, held, that the clear preponderance of the evidence fails to support a finding that the agreement for compensation was the initiatory contract of employment with respect to the matter therein referred to, but does support an instruction given by the trial court, to the effect that at the time of making said contract the relation of attorney and client existed between the parties; that the preponderance of evidence shows that defendant, at the time in question, concealed from his client material information relative to the value and extent of the estate, and as to the fact that another law firm had been previously employed by the executor, whose fees and expenses would be paid out

of the residuary estate, and who would have the burden of sustaining the will in case of a contest; that the trial court should have declared void said contract.

2.  Same—Purchase of Client's Interest in Estate by Attorney— Attorney's Representation of Value, Improper Interrogatory to Jury, as to—Evidence.

In the same suit, seeking also to set aside a contract of purchase by an attorney of his client's interest in the residuary estate, held, that the evidence fails to warrant the submission by the trial court of an interrogatory to the jury as to whether the attorney, at the time of making the contract, gave his client his opinion that the client's share in the estate was but $7,000.00; that the interrogatory should not have been so framed that it might be interpreted to mean the client's share after he had parted with one-third to the attorney, in view of the fact that the attorney himself testified that his representation of the value of the client's interest related to the whole residuary estate.

3.  Same—Communication of Facts as to Client's Property Purchased by Attorney, Whether Fair and Open—Consideration for Transfer of Client's Interest, Whether Full, Fair and Reasonable—Sufficiency of Evidence.

Held, also, that the findings of the trial court to the effect that the attorney fully and fairly communicated to his client information received by him as to the condition of the estate, and acted fairly, openly and honestly in all his dealings with him, and that the consideration for the conveyance by the client of his remaining interest in the estate to the attorney, was full, fair, and reasonable, were unsupported by the evidence; the consideration of such conveyance being the one-third interest already acquired by the attorney in the client's share by virtue of his employment as attorney, and $3,000 additional paid by the attorney to the client; the consideration stated in the conveyance being $6,000.00; the evidence showing that the conveyance and assignment of client's interest were procured by concealment of material information and facts in possession of the attorney, and by virtue of undue advantage and influence which he had over the client, and of the existing relations of attorney and client, and that the client did not have the independent advice of an attorney-at-law or other competent advice relative to the transaction; that the attorney at the time understood and believed that the residuary esate amounted to more than $9,000.00, that he believed that there would be no contest of the will, that he knew that the services and expenses of another law firm would be a charge against the residuary estate; that the client believed there was a probability of a contest of the will under which the residuary

estate so conveyed was derived; that the contract for the one-third interest already acquired by the attorney was unconscionable; that he failed to advice the client that the firm employed by the executor had the burden of contesting the will; that the attorney knew that if he was not required to assist in defending it, his own services would probably be nominal; that he concealed material information relative to the defense of the will and the charges therefor, and as to the time it would probably take to settle the estate, possessed by him; and that the client could recover the estate so conveyed, less the $3,000 paid by the attorney.

4.  **Evidence—Witnesses—Attorney's Letter to Client—Impeachment of Attorney, Admissibility.**

In a suit by a client to recover from an attorney certain property interests in an estate, transferred by him to the attorney, held, that a letter from another attorney, who was acting with the defendant in the transaction in question, and who had testified for the defendant, to the client, was improperly rejected by the trial court; the letter being offered for the purpose of impeaching the writer thereof.

Appeal from Circuit Court, Minnehaha County. Hon. ROBERT B. TRIPP, Judge.

Action by Theodore Kickland, against George W. Egan and another, to recover plaintiff's alleged interest in a residuary estate, and to set aside certain transactions between plaintiff and defendant, Egan. From a judgment for defendants, and from an order denying a new trial, plaintiff appeals. Judgment and order reversed, and cause remanded.

*Wagner & Danforth*, for Appellant.

*F. R. Aikens, and George W. Egan*, for Respondents.

(3) Under point three of the opinion, Appellant submitted that: Persons standing in a confidential relation towards others, must in order to entitle themselves to hold benefits which those others may have conferred upon them, show that the person by whom the benefits have been conferred, had competent and independent advice in conferring them; and cited: Jones Commentaries on Evidence, Vol. 2, Sec. 190.

GATES, J.  Plaintiff sought by this action to recover from defendant Egan the residuary assets of the estate of one Lafayette Kickland, which were on deposit in defendant bank amounting to $7,325.21, subject to the repayment of the sum of $3,000 to the defendant Egan, if the court should so find. Hereinafter the

word "defendant" refers to defendant Egan, unless otherwise mentioned. Recovery was sought on two grounds: (a) The invalidity of a contract whereby plaintiff assigned to defendant one-third of plaintiff's interest in said estate as a consideration for defendant's attorney's fees and expenses in the matter of the settlement of esaid estate; (b) the invalidity of a contract and deed for the real consideration of $3,000 and defendant's rights under the above contract, and the stated consideration of $6,000, whereby plaintiff's interest in said estate was assigned and conveyed to defendant.

This being an equity cause, the trial was had to the court, but a jury was called in an advisory capacity. At the conclusion of the trial, plaintiff moved the court to find all the issues in favor of plaintiff, viz.:

"(1) To find that the contract of employment and power of attorney obtained by the defendant Egan from the plaintiff on the 31st day of May, 1911, were procured by said defendant while the relation of attorney and client existed between him and plaintiff, by concealment of material information and facts then in the possession of and known to said defendant, and by undue advantage and undue influence of the defendant Egan over the plaintiff as a result of the relationship that existed between the parties, and without having given to the plaintiff such independent advice as he was bound to give the plaintiff, in view of the relation that then existed between them; it appearing that, neither before the contract or power of attorney were made, or at the time thereof the plaintiff had independent advice from a lawyer or any other person competent to advise him with reference to said transaction.

"(2) To find that the deed and assignment of plaintiff's interest in the estate of Lafayette Kickland, deceased, made September 1, 1911, were procured by the defendant Egan, while the relation of attorney and client existed between him and the plaintiff, and by the concealment of material information and facts then in possession of and known to said defendant, and by virtue of undue advantage and undue influence which the defendant Egan then had over the plaintiff, and by virtue of the relationship of attorney and client which then existed, and without having given to the plaintiff that independent advice which he should

have given him in view of the relationship then existing between the parties, and that the undisputed evidence shows that the plaintiff did not have the independent advice, or advice of any attorney at law or other person competent to advise him with reference to said transaction at or prior to the execution of said instrument.

"(3) To find and conclude as a matter of law that the contract of employment, power of attorney, deed, and assignment were, for the reasons above stated, void, and that defendant Egan acquired no right, interest, or estate whatsoever in the property herein described by virtue of same.

"(4) To find the defendant the Sioux Falls Savings Bank should be required to pay over to the plaintiff the sum of $7,-325.21, that being the amount deposited with said defendant by the agreement of the parties to this action to abide the result thereof; said amount being the proceeds of the plaintiff's interest of the estate of Lafayette Kickland, deceased, less the sum of $3,000, which the defendant Egan paid to the plaintiff at the time the deed and assignment were made.

"(5) That the court find the reasonable value of the services rendered by the defendant Egan under and by virtue of his employment by the plaintiff, with reference to the estate of Lafayette Kickland, deceased, and award him such amount as the court shall so find to be reasonable out of the balance of said deposit."

This motion was denied, and the court gave its instructions to the jury. The material portion of such instructions was as follows:

"At the time of making the contracts involved in this case, the relation of attorney and client existed between Mr. Egan and the plaintiff, Theodore Kickland. That is a relation involving confidence, and is what is called a 'confidential relation' within the meaning of the law. Because of this, and the attorney's presumed superior legal information and possible influence, the usual rule of the presumed validity of contracts is changed, and it devolves upon the attorney to show that his transaction with his client was fairly conducted, as if between strangers.

"To express the same view in a little different language, the law is that when the relation of attorney and client exists, a trans-

action between them is presumptively fraudulent, and if the propriety of it comes in question, the burden is upon the attorney to show that no undue influence was used, or advantage taken, and that he gave his client all of the information and advice, as against himself, that was necessary to enable him to act understandingly.

"Still it is not the law that all purchases by an attorney of his client's property, or transactions between them, are voidable at the wish or election of the client. There is no necessary incapacity for dealing between them, but, as stated, the burden rests upon the attorney who bargains with his client in a matter of advantage to himself to show that the transaction is fair and equitable; that the client was fully informed of his rights and the nature and effect of his contract, and was so placed as to be able to deal with his attorney at arm's length."

As a part of such instructions the court submitted six interrogatories, which, with the answers thereto returned by the jury, are incorporated in the findings. As will be observed, the court rejected one of the said answers and adopted the other five. The learned trial court thereupon made the following findings of fact and conclusions of law:

"Findings of Fact.

"I. That the above-named defendant Egan is, and prior to and on the 31st day of May, A. D. 1911, was, an attorney and counselor at law, duly licensed to practice his profession in all the courts of this state. That on said 31st day of May, A. D. 1911, he entered into an agreement in writing with plaintiff, of which the following is a copy, to-wit [attached by reference]. That said agreement was the initiatory contract of employment with respect to the matter therein refered to. That prior thereto in regard to said matter the relation of attorney and client did not exist, although in the month of January, A. D. 1911, plaintiff had disclosed to said defendant Egan many essential facts concerning the physical condition of said Lafayette Kickland; the making of the will; the threatened and probable belligerent attitude of other relatives or heirs concerning the will; and the probable amount of property that plaintiff would receive by the terms of said will upon the death of said Lafayette Kickland—which information

formed, to a considerable extent, the basis upon.which the agreement in this finding was based. That said agreement was, under the conditions and circumstances then existing and known to the parties thereto, fair and reasonable, and its execution by plaintiff was not induced through concealment by defendant Egan of material facts or information that should have been disclosed or conveyed by him to plaintiff, nor was the same procured by said defendant Egan through fraud or undue influence practiced upon plaintiff by him. That in making this finding the court adopts as its own the decision of the jury in its disposition of the following interrogatories submitted to it, to-wit:

" '1. Was the plaintiff, Mr. Kickland, induced to make or sign the contract of May, 1911, employing Mr. Egan, through defendant's concealment of material facts or information from him, Mr. Kickland? Answer: No.'

" '2. Was the document referred to in the last question procured by Mr. Egan through fraud or undue influence? Answer: No.'

"II. That on the 1st day of September, A. D. 1911, plaintiff, for and in consideration of the interest that defendant Egan had acquired in plaintiff's share in the estate of said Lafayette Kickland, deceased, by virtue of the contract of employment referred to in finding I, hereof, and the further consideration of $3,000 in hand paid to plaintiff by said Egan on said day, conveyed to defendant Egan all his right, title, and interest in and to his share in the estate aforesaid by the following instruments in writing, to-wit [attached by reference]. That said instruments, to-wit, said deed and assignment, were not procured by said defendant Egan through his concealment of material facts or information that should have been disclosed or conveyed by him to plaintiff, notwithstanding the fact that the decision of the jury in its disposition of the following interrogatory, that is to say: ·

" '3. Was the plaintiff, Mr. Kickland, induced to make or sign the assignment and deed of September 1, 1911, through defendant's concealment of material facts or information from him, Mr. Kickland? Answer: Yes.'

"That the court declines to adopt said findings or interrogatory 3, for the reason that the documents referred to therein were not, in its opinion procured by defendant Egan through fraud or

undue influence, which is not only the finding of the court, but was also specially so found by the jury as follows:

"'4. Were the documents referred to in the last question procured by Mr. Egan through fraud or undue influence? Answer:   No.'

"That not only did the jury find directly in its answer to the fourth interrogatory submitted to it that defendant Egan was innocent of fraud and the exercise of undue influence ,but also specifically further found as follows:

"'5. Did the defendant Egan, at the time he purchased from plaintiff his interest in the estate of Lafayette Kickland, deceased, and before the signing and delivery of the papers to plaintiff, state to plaintiff and to his son, J. J. Kickland, that, in the opinion of said Egan, said plaintiff's share in the estate, if the will was sustained, would amount to about seven thousand dollars?   Answer: Yes.'

"'6. On the occasion referred to in the foregoing question (5) did the said Egan state to plaintiff and to his son, J. J. Kickland, and before the signing and delivery of the papers to plaintiff, that it would probably take about two years to settle the estate?   Answer: Yes.'

"Which said findings of the jury 5 and 6, the court adopts as its own.

"III. That the defendant Egan, at all times between the 31st day of May, A. D. 1911, and the 1st day of September, A. D. 1911, fully and fairly communicated to plaintiff, either personally or through his son, J. J. Kickland (who was authorized by plaintiff to look after his affairs and act for him), all the material information received by said Egan from any and all sources concerning the condition of the matter of the estate of Lafayette Kickland, deceased, and concealed and withheld nothing material in the way of information with respect thereto from plaintiff, but in all his dealings with plaintiff concerning the matter of said estate he acted fairly, openly, and honestly, and had no reason to believe, nor did he believe, that plaintiff did not fully understand and clearly comprehend the matters and things so communicated to him as aforesaid by said defendant Egan.

"IV. That the consideration for the conveyance referred to in finding II hereof was, under the circumstances and conditions then

actually existing and concerning the estate of said Lafayette Kickland, full, fair, and reasonable. That the amount of the interest of plaintiff in and to the estate of said Lafayette Kickland, deceased, was, as appears from the pleadings in this case, the sum of $7,325.21. That the estate of said Lafayette Kickland was finally closed, as shown by the pleadings herein, on or about the 1st day of September, 1913, or practically two years from the 1st day of September, 1911.

"V. That the above-named defendant, Sioux Falls Savings Bank, has on deposit, by virtue of a stipulation entered into between plaintiff and defendant Egan, to await and depend upon the decision of this case, the sum of $7,325.21 in cash, which said sum is the sole property and belongs to the defendant Egan.

"VI. That the defendant Egan never, at any time, conceled from plaintiff any material fact, or facts, within his knowledge, nor did the said Egan ever falsely or fraudulently represent any material fact to plaintiff concerning the condition of the estate of Lafayette Kickland, deceased, nor did the said defendant Egan wrongfully or fraudulently induce plaintiff to sign either the power of attorney, contract for attorney's fees, the assignment of plaintiff's interest in the personal estate, nor the deed conveying the real estate belonging to the estate of said Lafayette Kickland, deceased, and none of the allegations contained in the amended complaint with reference to the procurement and execution of said instruments, or any one of them, inconsistent with the findings, are sustained by proof, but that the same were met by the evidence produced by said defendant, and by a preponderance of the evidence wholly and totally disproved.

"Upon the foregoing findings of fact, the court makes and orders filed the following:

"Conclusions of Law.

"That the complaint in this action should be dismissed upon its merits.

"II. That defendant Egan should have and recover of plaintiff his costs and disbursements herein.

"III. That the above-named defendant, Sioux Falls Savings Bank, of Sioux Falls, S. D., should pay to defendant Egan the sum of $7,325.21, being the amount on deposit in and held by said defendant bank to be disposed of in acocrdance with the de-

cision of this court in this case, in accordance with the terms of the stipulation entered into between plaintiff and defendant Egan.

"Let judgment be entered accordingly."

Judgment was entered in favor of defendant.    Therefrom and from an order denying a new trial, plaintiff appeals.

[1] With reference to the first finding we have this to say: That the clear preponderance of the evidence does not support the finding "that said agreement was the initiatory contract of employment with respect to the matter therein referred to," but does support the following instruction, which the trial court gave to the jury, viz.:

"At the time of making the contracts involved in this case, the relation of attorney and client existed between Mr. Egan and the plaintiff."

The correspondence between defendant and a Cleveland law firm clearly shows that the relation of attorney and client was not terminated when plaintiff, through defendant, on January 18, 1911, restored to the Cleveland firm $540 for the use of Lafayette Kickland's guardian.    It clearly shows that defendant still considered plaintiff to be his client in regard to Lafayette Kickland's will.    Defendant admitted that the Kicklands (plaintiff and his son, J. J.) were in his office five or six times between January 9, 1911, and May 31, 1911.    He referred to them in the correspondence above mentioned as "my clients."    Furthermore, defendant said upon the witness stand, "I do not deny that he was my client at no time."    Furthermore, defendant's testimony, when called as an adverse witness for plaintiff indicates the correctness of our conclusion.    At the time of the trial of this case and of the entry of findings, conclusions and judgment, the decision of this court in Egan v. Burnight, 34 S. D. 473, 149 N. W. 176, had not been rendered.    It was rendered on October 26, 1914, and appeared in the Northwestern Reporter Advance Sheets of November 20, 1914.    The motion for a new trial in the present case was heard January 7, 1915, and decided January 21, 1915.    The trial court should have known of that decision at the time it had the motion under consideration.    If the court then knew of such decision, we do not see how it could have sustained its decision with reference to the contract of May 31, 1911.    That decision showed that the trial court did not correctly instruct the jury in this case

with reference to the subject of attorney and client. It further showed that if the trial court was then of the opinion that the relation of attorney and client existed (as it apparently was from the instruction), it should have held the contract of May 31, 1911, invalid. The clear preponderance of the evidence shows that defendant did conceal material information from his client at that time. On the day of making of the contract, he was in receipt of the following letter from the Cleveland law firm:

"May 29, 1911. Mr. George W. Egan, Attorney, Sioux Falls, South Dakota—Dear Sir: We have just been phoned by the guardian of Lafayette Kickland, that Lafayette Kickland, committed suicide this morning by hanging himself in the barn. We write you thus promptly that you may be fully advised in the premises. Theodore Kickland, your client, is the residuary legatee under the will, and unless the will be set aside, will receive somewhere from $6,000 to $10,000.00. The guardian, Augustus McVeigh is the executor, and the will is in proper shape, and I think can be sustained without a doubt, although there may be trouble or a contest over it. We suggest that you get in touch with Theodore Kickland at once, represent him in all his interests here, and then place the same in our hands for legal attention and management on the ground, and have Theodore come to our office when he touches Cleveland the first place. We however will do the best for him through you as no possible conflict can arise in any way, we representing the executor, and of course will defend the will if the same is assaulted, all of which is to the interest of Theodore Kickland, and of course we can represent him from beginning to end. It is wholly unnecessary if we have charge of it for Theodore to come at this time, as the will will have to be probated, the executor qualify, notice given, inventory made and filed all before anything can be done with reference to distribution, or payment of legacies named in the will, and yet it is very important that Theodore be represented from the start.

"Now Mr. Egan you have acted so fair and promptly with us in other matters that we feel you should control and direct his interest now through us in this estate, so please get into communication with him, get power of attorney from him to you to prepresent him in all matters, and for you to employ such persons as you see fit here to look after his interests.

"Please write us as soon as you receive this and get things in shape.

"Very respectfully,

"Ong, Thayer & Mansfield."

Defendant, therefore, must have known that the services and expenses of the Cleveland firm would be a charge against the residuary assets, and that upon such firm would devolve the burden of defending the will. He must have known that, upon such a state of facts, a contract for one-third of the residuary estate (then understood by him to amount to from $6,000 to $10,000) for his own services and expenses was unconscionable. Depositions of Cleveland attorneys were offered in evidence tending to show that a contingent fee of one-third of an estate was a reasonable fee where there was a probable contest of the will. The testimony of none of said attorneys contemplated the situation here shown, to-wit, the previous employment by the executor of a firm whose fees and expenses should be paid out of the plaintiff's share of the estate, and upon whom would rest the burden of sustaining the will in case of a contest. It is claimed by defendant that he showed this letter of May 29th to the plaintiff. That is denied by plaintiff and his son, and their testimony is corroborated by the testimony of Bertha Walz, who says she heard all of the conversation between plaintiff and defendant, and who claims to have reproduced all of the same in her deposition. She was defendant's clerk and stenographer, and was called as a witness by defendant. But even if defendant did show the letter of May 29, 1911, to plaintiff, defendant did not claim that he explained to plaintiff the legal effect of the employment of the Cleveland firm by the executor. Even if the relation of attorney and client had not then existed; even if this letter of May 29th had been written to plaintiff instead of to defendant, it was defendant's plain duty, before bargaining for a fee, to have advised plaintiff that, inasmuch as the executor had employed the Cleveland firm to defend the will, the burden of the defense would fall upon that firm. He should have frankly advised plaintiff that, unless he was required to go to Cleveland and assist counsel already employed in defending a contest of the will, his services would, in all probability, be nominal. He should have advised plaintiff that the services and expenses of the Cleveland firm would be a charge

against the residuary estate. None of these things did defendant do. In the language of Egan v. Burnight, supra:

"The attorney * * * cannot be allowed to place a pot of gold over against his duty and the rights of his client."

It is entirely clear to us, not only that the relation of attorney and client in this matter then existed, but also that, at the time of securing the contract for one-third of the estate, the defendant concealed material information from the plaintiff. The trial court should have declared void the contract of May 31, 1911.

[2] With reference to the second finding, we are of the opinion that the evidence clearly warranted the affirmative answer of the jury to interrogatory 3. How the jury could answer "Yes" to that interrogatory, and "No" to interrogatory 4, is more than we can comprehend, except upon the theory that the jury did not understand the meaning of the latter interrogatory. The evidence did not warrant the submission of the fifth interrogatory in the form in which it was submitted. The trial court should have asked the jury if defendant told Kickland that the residuary estate of Lafayette Kickland would amount to about $7,000, and should not have so framed the interrogatory that it might be interpreted as meaning plaintiff's share after he had parted with one-third to defendant. Bertha Walz, who was at that time defendant's secretary and stenographer, and who was defendant's witness, read her stenographic notes of the conversation (hereinafter set out), which clearly showed this to be the fact. Indeed the defendant so testified, and in respondent's brief the position is clearly taken that the representation of value related to the whole residuary estate.

[3] The evidence did not warrant the court's findings III, IV, and VI, but did warrant a finding, in substance, as requested by plaintiff in item 2 of his motion for judgment above set forth. It is true that there is a direct conflict between the oral testimony of plaintiff and his son upon the one hand and of the defendant on the other hand, but we are of the opinion that the written word (hereinafter set out), supplemented by the stenographic notes of defendant's witness Bertha Walz, and her testimony, caused the evidence to clearly preponderate in flavor of plaintiff. In 1911 the plaintiff, a resident of Minnehaha county, was 75 years of age. The previous autumn he made a visit to his aged uncle, Lafayette

Kickland, at the farm of the latter near Cleveland, Ohio. Plaintiff's son, J. J. Kickland, also was there a part of the time. While they were there Lafayette made his will by the terms of which the plaintiff was made the residuary legatee and devisee. The personal property of Lafayette, as disclosed by the executor's account, amounted to more than $4,000. The real estate consisted of 29.96 acres situated about 14 miles from Cleveland, Ohio. The will provided for legacies amounting to $1,800 with the residue to plaintiff. About the time plaintiff and his son departed for the West, plaintiff received from Lafayette $40 in money and $500, either in money or as the proceeds from the sale of a team of horses, given by Lafayette to plaintiff. Shortly thereafter a guardian was appointed for Lafayette. On January 4, 1911, the Cleveland law firm above mentioned, acting as attorneys for the guardian, wrote plaintiff, demanding a return of the $500, claiming that the $500 were merely given to the plaintiff to keep for Lafayette, and that unless the money was returned, the will would be changed. Plaintiff consulted defendant and, as the result of defendant's advice the $540 were restored to the guardian. The Cleveland firm acknowledged receipt of the money and, among other things, said:

"You may say to Theodore Kickland and J. J. Kickland that no change or alteration of any kind or character will be made in the last will and testament of Lafayette Kickland, written while Theodore Kickland was with Lafayette, also written at the time and under such circumstances as will sustain the will if it is ever assaulted."

(Truly, these letters indicate a remarkable control over an incompetent.) Several letters then passed between defendant and the Cleveland law firm. Finally, on May 29, 1911, the Cleveland firm wrote defendant the letter hereinbefore set out. This letter was received by defendant on May 31, 1911. On that day the contingent contract for one-third of the estate above mentioned was entered into, the power of attorney obtained, and defendant wrote the Cleveland firm among other things, as follows:

"I have every reason to believe that you will be absolutely square with us but I feel that I should find out from you something about what you think you would have to do and what you would feel that you should charge me, because I want to have a

thorough understanding that no criticism could be brought to me as a result of the transactions in the estate."

On June 8, 1911, the Cleveland firm replied in part as follows:

"Now Mr. Egan before we can name a fee or limit in Theodore Kickland case, we want some understanding from you, or your idea as to how the business should be handled between us. Shall the fee in the end in looking after and protecting Theodore Kickland's interest in the estate of Lafayette Kickland be divided equally between us, or shall we go on and render this service for you and make our charges independent of yours and your interest in the case? We can do it either way, but much prefer to handle the entire matter from beginning to end jointly with you, and an equal division of a reasonable fee at the end or closing up of the estate. We now represent three of the legatees, to-wit: Mrs. Cora Burgess, legacy, $1,000.00, Mr. Martin Kickland, legacy, $300.00, and Mr. Augustus McVeigh, legacy, $500.00. We had a hearing this morning in the probate court on the probation of the will. The nephews were there three or four of them, bitterly protesting as to the probating of the will, and seeking to have evidence introduced to show that Lafayette Kickland was not of sound mind at the time he made the will, we beat that, had the will probated, bond fixed and given. They doubtless will bring action to contest the will, which will mean a long, hard fight, although we feel safe in the defense of the will, as Mr. Mansfield, the junior member of our firm, and Mr. Ong, the senior member of the firm, are the witnesses to the will."

On June 19, 1911, the defendant was at Cleveland and consulted Mr. Ong. At that time the will had been admitted to probate. The objections thereto had been overruled, but the objectors had one year thereafter within which to institute a contest. On June 22, 1911, the Cleveland firm wrote defendant in part as follows:

"We enclose complete statement of each estate of the Kicklands, and a statement showing the total amount of Lafayette Kickland's estate at the time of his death. The statements contain the exact facts and the full situation.

"Now Mr. Egan we have talked over the matter with reference to your interest as representing Theodore Kickland, and

while it is very uncertain as to the amount of services to be rendered, and the fair value thereof, yet as requested by you I have this to say: That we will take care of your interest as representing Theodore Kickland from beginning to end, and if suit is brought to contest and set aside the last will and testament of Lafayette Kickland, deceased, then our fees so far as you are concerned for Theodore Kickland shall not exceed $500.00. We do not think it will reach that amount, but it is impossible for us to be more definite at this time. If will is not contested, then in the end the care and services in looking after both his will and personal property shall not cost to exceed $300.00. We feel the limits can thus be placed in fairness to you as well as ourselves, owing to the conditions of the different Kickland estates and the different claimants to and on said estate.

"Hope this may be satisfactory to you and if so please answer, directing us to take charge of and look after your interest as the representative of Theodore Kickland."

In July, defendant wrote the Cleveland firm, asking if an advancement could be made to plaintiff. As a part of the reply, the Cleveland firm advised the defendant that they had been offered $250 an acre for the land, and that they believed an adjoining owner would pay $275 per acre:

"What the man wants to do that has made the offer of $250 per acre is to enter into a written contract with Theodore Kickland whereby he is to convey to this man the farm on the 9th day of June, 1912, for whatever price may be agreed upon, in cash at that time. What do you say? This land is not in the general market as a farm, for the reason there are no improvements on it and the acreage is very small, and it is only special opportunities that will command the price."

On August 7, 1911, defendant wrote the Cleveland firm, asking for a description of the land and saying:

"I feel that yourself and Mr. Mansfield being witnesses to the will, that there is no question but what it will be held good. I have examined the will and of course find it regular and legal in every particular and the testimony of yourself and Mr. Mansfield, it seems to me, places the validity of the will beyond any reasonable doubt, and I am relying on that."

On August 15, 1911, the Cleveland firm replied, inclosing the description and saying:

"I do not feel that $275.00 per acre is excessive and yet I feel that it would be a very reasonable sale for Mr. Kickland, but you and he can consult as to that and advise me of the conclusion reached by you. The Kickland matters from beginning to end are standing just where they stood when you were here, except Mr. McVeigh has qualified as executor, and is simply standing and waiting for something to turn up. Of course he can do nothing in the way of distributing the estate until the year expires. I spoke to him about an advancement to Theodore, but he declines to make any payments until he is authorized so to do by the probate court, and will make no order of distribution until the expiration of the year and the final account is filed and approved."

On August 17th defendant wrote the Cleveland firm, asking if it was necessary to set out in full the long metes and bounds description in case a conveyance was made. On August 24th the Cleveland firm answered said inquiry in the affirmative, and said:

"The agent with whom I had talk about the sale of the place at $250.00, and the one I think would agree to give $275, if the same can be legally conveyed to him at the expiration of the year for contest of wills, would I believe give $275.00, although no intimation of that kind has passed from him to us."

On August 23d defendant wrote the Cleveland firm in part as follows:

"My client Mr. Kickland was disappointed that McVeigh could not make him an advancement at this time.

"He has requested me to make him an advancement or buy his interests or do something to help him. I would like to help him if I could do so without taking any chances. Personally, I have felt that there is no question but what that will will be held good since it was witnessed by both you and your Mr. Mansfield."

This letter appears to have been unanswered. On August 25th, 1911, defendant wrote plaintiff as follows:

"I have been looking up the money market to see how money was in connection with our other deal. I can get you $1,000.00 in cash and give you a bankable note, which is good at any bank for one year drawing 6 per cent. interest. You can go over and see the bankers and they will tell you that the note is absolutely

good.   It seems awful hard to get all cash at this time and I would be much pleased if you could make this kind of an arrangement with me.   That is to take $1,000.00 and take a note for $2,000, drawing 6 per cent. interest due in one year.

"This 6 per cent. interest on the money would bring you $120.00 a year or $10.00 a month which added to your pension would make you $27.00 a month to live on.   Let me know what you think about this, so as I will know about getting papers all prepared."

On August 31, 1911, defendant wrote the Cleveland firm as follows:

"I am contemplating purchasing the interest of Theodore Kickland or at least advancing him considerable money on it.  * * *

"As I have intimated to you before, I have implicit confidence that the will cannot possibly be set aside, having been drawn by yourself and witnessed by two members of your firm and Mr. McVeigh, whom I understand to be a prominent citizen, is of course interested in having it held good.   I wish you would if necessary consult with Mr. McVeigh and then advise me as to the amount of the estate that will come to Theodore Kickland, if the will is held good, assuming that he could get $275.00 per acre for the land."

On September 1, 1911, plaintiff and his wife executed and delivered to defendant, a warranty deed of the Ohio land and an assignment of plaintiff's interest in the personal estate.   That transaction took place in defendant's office.   The only people present, according to the testimony of defendant's witness, Bertha Walz, were herself, the plaintiff, his wife, his son, and the defendant.   The following is the material portion of the conversation had at that time as taken down by Miss Walz:

"Mr. Egan:   Now from what I know, if I give you this money for your two-thirds interest and should win the case in a couple of years from now, at the request of my enemies you people might turn on me and try to make me trouble.   As I told you I think the whole estate will amount to $7,000, and if we win the case, it will take about two years to settle it up.   I have enemies here, who for $25, would induce you to swear to anything to put me in an unfavorable light.

"J. J. Kickland: No danger of us turning against you Mr. Egan. We know you are paying all father's interests are worth, and we know that you have to fight the case, take the chances.

"Mr. Egan: John, will you and your father stand by me and fight and give me your deposition if I close the deal?

"J. J. Kickland: Of course we will.

"Mr. Egan: I will state that in the papers.

"J. J. Kickland: All right, go ahead and we will sign them, and we would like to get home as soon as we can.

"Mr. Egan: Well it is not a good business deal for me, but if you folks insist on it, I will take the chance, and you certainly cannot say that I have taken any advantage of you because I would rather not put any more in, because I have all of my expense and my one-third interest in the thing now.

"J. J. Kickland: We are satisfied, and we will stay by and help win the case if it is possible. We understand it, and you are dealing fair with us, and we are glad to get the money.

"Mr. Egan: Of course if I lose, I would not be able to recover this $3,000, and I do not expect it.

"J. J. Kickland: Well, I understand that, and we have talked about that.

"Mr. Egan: The appraisement shows the land was appraised at $5,800. Judge Ong told me it was worth a considerable more than that, and I believed it, and if the estate would amount to $7,000 or over, your two-thirds interest would be more than the $3,000, but you know there is a chance to take of the lawsuit and then you get your money now. As I stated to you, it will take two years to settle up the case.

"Theodore: We are satisfied, Mr. Egan, and we are here to close the deal.

"J. J. Kickland: It is all right; we understand it all.

"Mr. Egan: Then I will dictate the papers."

Defendant testified that he had sent to plaintiff the correspondence from Cleveland and that therefore the plaintiff and his son were as fully informed as to the condition of affairs as he was. Plaintiff and his son stoutly denied that they received from defendant the Cleveland correspondence, and denied that they had any knowledge that the land could be sold for $275 per acre. Plaintiff is corroborated to this extent at least, that is, if the cor-

respondence was sent it was without the knowledge of Miss Walz, defendant's office clerk and stenographer. She testified that the first communication to the Kicklands after May 31st that had anything to do with this matter was on August 25, 1911. It may be pertinent to inquire why, if defendant had shown these letters to plaintiff, he caused Miss Walz to get a copy of the inventory and read it to plaintiff on September 1st. Truly there was no reason or excuse for calling attention to the fact that the land was appraised at only $5,800 if plaintiff was fully informed as to the contents of thees letters. A reading of the testimony of Miss Walz, just detailed, would also indicate that the Kicklands were expressing satisfaction with the transfer based upon the assumption that the land had been appraised for $5,800 and also that the whole residuary estate would amount to $7,000 It is true that the residuary estate finally amounted to only $7,325.21, but an inspection of the account of the executor shows the following: Personal assets, $4,280.51; received from sale of real estate, $8,989.80; total receipts, $13,270.31. The total expenses were $5,-945.10, which embraced, in round figures, the following items: Last illness and funeral expenses $240; expenses of administration $350; executor's commission $410; legacies $1,800; paid to contestants $1,000; attorney's fees to Cleveland attorneys $2,140. Let it be remembered that at this time the contest of the will had not been filed, and that defendant was confident that the will would stand, and that he had been fully informed as to the amount of the estate. Suppose, therefore, we eliminate the $1,000 paid to contestants and substitute the agreed maximum attorney fee of $500 in place of the sum of $2,140, charged and paid, and also reduce the value of the real estate from $8,989.80 to $8,250, viz., 30 acres at $275 per acre, and we will find the net supposed value of the estate at that time to be more than $9,200. The written words leads strongly to the conclusion that defendant thought he was then acquiring two-thirds of at least that sum, viz., upwards of $6,100, for the sum of $3,000, and that plaintiff thought he was parting with not to exceed two-thirds of $7,000, or $4,667. But suppose defendant did show plaintiff the Cleveland correspondence received by him between May and September, 1911, he was equally guilty of unprofessional conduct. He testified:

"I received a letter from Judge Ong. That was August 4,

1911, and the question of the value of the 30 acres was spoken of and J. J. and Theodore both stated to me there was certainly some mistake about that, because the land was very rough and there was a portion of it that was rocky and covered with scranty oaks or brush of some kind, and that the land could not possibly be worth over $125 or $130 per acre. They said Judge Ong must have made a mistake in his letter.

Defendant also testified on cross-examination as follows:

"After getting the letter from Judge Ong, where he said he had an offer of $250 an acre, I took my pencil and figured out that it would probably net about $7,000. I figured it out in the presence of the Kicklands and told them that, in my judgment, it would be about $7,000. I told them that I owned a one-third interest under my contract. I says, 'I own one-third interest of $7,000.' Then they said to me, 'We will take $3,000 if you will give it to us.' Then I said to them: 'Three thousand dollars for $4,600 with a contingency. The present worth of the money does not leave much of a margin.' John said 'they understood that.' Uncle Theodore says, 'Three thousand dollars to us now means more than $4,600, if it comes out just as you say.' J. J. said he had some obligations he had to meet, and that he had mortgaged his farm to the Sioux Falls Savings Bank, and he needed it. I should state that the premises on which I figured was wrong, because I figured, from all the facts in my possession, there would be $1,500 personal estate outside of the land, and that is why I took an assignment of the personal estate. I figured the land what they told me it was worth; what they told me it was worth in the markets of the world."

Defendant was then justified from the facts in his possession in believing and saying that the net personal estate, after the payment of legacies and expenses of administration, would amount to about $1,500, but he was not justified in figuring the land on the basis of what he claims plaintiff told him it was worth, viz., $5,500 or less, when he then believed, as shown by the correspondence, that the land could be sold for $275 per acre. It is clear to us from his own testimony that in making this computation defendant was acting for himself, and not for his client. Moreover, in telling the plaintiff that it would take two years from September, 1911, to settle the estate he was not communicating the

facts as he then believed them to be, although the outcome justified his statement. As is shown by his letters, he did not believe there would be a contest of the will, and he did believe the estate would be settled in June, 1912.

If it had not been for the contest and the payment of $1,000 to the contestants, and the payment of an unexpectedly large and apparently unwarranted attorney's fee to the Cleveland attorneys, the personal assets would have been sufficient to pay all of the expenses, and the sale of the real estate by the executors would have been unnecessary, and the largely increased expenses of administration because of a sale of the land by the executor would have been unnecessary, and plaintiff could, in June, 1912, have conveyed the land by his own deed. The letters above mentioned and the executor's account so indicate. The point of view of defendant, at the time he purchased the two-thirds interest, is also evidenced by his letter of December 9, 1911, to the Cleveland lawyers, written upon the receipt of the announcement that a contest had been instituted, wherein he said:

"I have your letter of December fourth and was very much surprised to know that an action had been begun to set aside the will. I propose to be perfectly frank with you and tell you that I am very much interested in this matter, because I have put over three thousand dollars in cash of my own money in this estate and made the advancements to Theodore Kickland, taking proper papers of assignment, deed, etc., in addition to a lot of my time and expenses. I did this after my visit with Judge Ong and my absolute reliance upon the fact that this will could not be set aside" —and again on January 9, 1912, he wrote them:

"When I looked the situation over back there and examined the will and considered the whole situation, I did not suppose that there would be any suit to set it aside filed, although I realized that such could be done. * * * My implicit confidence in Judge Ong and his firm was what of course prompted me to accommodate my friends out here by buying their interest. I have no doubt whatever but what the will will be sustained. * * * Now, if you think that I should file my deed and records at once, I will do so. I did not pay any particular attention to it thinking of course that the estate would be settled up in June."

Considering the evidence in the light most favorable to defendant, the overwhelming weight of testimony offered on behalf of defendant, viz., the testimony of Miss Walz, Mr. Dennis, Mr. Glover, and perhaps some other testimony, indicates that defendant gave the plaintiff to understand that the residuary estate would amount to about $7,000. Undoubtedly, Mr. Dennis in advising plaintiff in regard to closing the deal believed that plaintiff was getting $3,000 in cash as an equivalent for $4,600 at the end of two years, with the possibility of a loss to defendant. But it is equally certain that defendant believed that the land would bring $2,000 more than the appraised value, and therefore that he deceived plaintiff to that extent.

Another matter that seems to be of importance is the question as to when the thought of purchasing this property first entered defendant's mind. Defendant testified that plaintiff wanted him to go to Cleveland to see if he could get an advancement from the executor. He repeatedly testified as to plaintiff's desire to get some money by way of advancement, but his testimony will be searched in vain to find one word to the effect that plaintiff ever suggested the purchase of the property by him until after he had returned from Cleveland. Yet we find Judge Ong's testimony, taken on behalf of defendant, wherein upon direct examination he stated that defendant in June, 1911, asked him, in relation to what amount he should pay for this property, if he should buy it. It seems from the testimony that Judge Ong was somewhat surprised at the inquiry, as he might well have been. It appears from a reading of the whole record that defendant had conceived the idea of purchasing this property long before the plaintiff expressed any desire to sell.

As has been previously shown, the residuary estate amounted to only $7,325.21, but we may not judge the transaction of September 1, 1911, by its outcome. It must be judged by what the parties believed the situation to be at the time defendant made the purchase, bearing in mind that the relation of attorney and client then existed. So judging it, we unhesitatingly conclude that the clear preponderance of the evidence shows that at that time defendant believed the residuary estate would amount to more than $9,000; that he then believed there would be no contest of the will; that plaintiff believed the residuary estate would

amount to $7,000, with at least a strong probability of a contest of the will. Therefore, applying the principles laid down in Egan v. Buright, supra, we are clearly of the opinion that item 2 of plaintiff's motion for judgment, supra, stated the law as to that transaction, and that judgment should have been entered in accordance therewith.

[4] There was one ruling in particular upon evidence which we thinks demands consideration, and that is the rejection of the letter, Exhibit E, written by the Cleveland lawyer to plaintiff under date of March 5, 1913. It was offered for the purpose of impeaching the oral testimony of that lawyer as a witness for the defendant. It was competent for that purpose, and its rejection was clearly prejudicial to plaintiff.

For the reasons given, the judgment and order denying a new trial are reversed, and the cause is remanded, for further proceedings not inconsistent herewith.